1  MATTHEW G. JACOBS (Bar No. 122066)
   matthew.jacobs@dlapiper.com
2  ALEXANDER M. MEDINA (Bar No. 222015)
   alexander.medina@dlapiper.com
3  DLA PIPER US LLP
   400 Capitol Mall, Suite 2400
4  Sacramento, CA  95814-4428
   Tel:  916.930.3200
5  Fax:  916.930.3201

6  Attorneys for Plaintiffs
   VIDEO GAMING TECHNOLOGIES, INC.,
7  UNITED CEREBRAL PALSY OF GREATER
   SACRAMENTO, WIND YOUTH SERVICES,
8  ROBERT FOSS, and JOAN SEBASTIANI

9  ADDITIONAL COUNSEL LISTED ON
   FOLLOWING PAGE

10

**E-filing**

11            UNITED STATES DISTRICT COURT

12          NORTHERN DISTRICT OF CALIFORNIA

13              SAN FRANCISCO DIVISION

14  VIDEO GAMING TECHNOLOGIES,         CASE 08          2748
    INC., dba VGT, Inc., a Tennessee
15  Corporation; UNITED CEREBRAL       PLAINTIFFS' *EX PARTE* MOTION FOR
    PALSY OF GREATER SACRAMENTO,       TEMPORARY RESTRAINING ORDER AND
16  a California Non-Profit Corporation; ORDER TO SHOW CAUSE REGARDING
    WIND Youth Services, a California Non- PRELIMINARY INJUNCTION AND
17  Profit Corporation; ROBERT FOSS, an MEMORANDUM OF POINTS AND
    individual; JOAN SEBASTIANI, an    AUTHORITIES IN SUPPORT THEREOF
18  individual,
                                       Date:
19            Plaintiffs,              Time:
                                       Dept.:
20       v.                            Judge:

21  BUREAU OF GAMBLING CONTROL, a
    law enforcement division of the California
22  Department of Justice; MATHEW J.
    CAMPOY, in his official capacity as the
23  Acting Chief of the Bureau of Gambling
    Control,
24
              Defendants.
25

26

27

28

DLA PIPER US LLP

*EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
               MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1

**ADDITIONAL COUNSEL**

2    GEORGE GIGOUNAS (Bar No. 209334)
     george.gigounas@dlapiper.com
3    DEBORAH E. MCCRIMMON (Bar No. 229769)
     deborah.mccrimmon@dlapiper.com
4    DLA PIPER US LLP
     153 Townsend Street, Suite 800
5    San Francisco, CA 94107
     Tel: 415.836.2500
6    Fax: 415.836.2501

7    RAVINDER MEHTA (Bar No. 113805)
     rmehta@capital-advocates.com
8    CAPITOL ADVOCATES
     1215 K Street, 17th Floor
9    Sacramento, CA 95814
     Tel: 916.486.1955
10   Fax: 916.485.2509

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DLA PIPER US LLP

*EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................1

II.  FACTUAL BACKGROUND.................................................................................2

    A.   The Cease-and-Desist Orders ...................................................................2

    B.   The California Bingo Law ........................................................................3

    C.   The Plaintiffs in This Case........................................................................4

    D.   VGT's Electronic Bingo Aids...................................................................6

    E.   The Bureau's Interpretation of Section 326.5 and Its Refusal to Withdraw the Orders........................................................................................7

III. ARGUMENT.........................................................................................................8

    A.   Legal Standards for Injunctive Relief.......................................................9

    B.   Plaintiffs Are Likely to Prevail on Their Claim That VGT's Electronic Bingo Aids Comply With Even the Bureau's Unlawful Interpretation of Section 326.5 Because They Provide Paper Cards ...................................9

    C.   Plaintiffs Are Likely to Prevail on Their Claim That the Bureau's Interpretation of Section 326.5 Violates Federal Law Because It Discriminates Against Disabled Individuals.............................................10

        1.   Overview of ADA........................................................................10

        2.   As Written and Enforced Section 326.5 Must Comply With the ADA.............................................................................................12

    D.   Plaintiffs Are Likely to Prevail on Their Claim That the Bureau's Interpretation of "Card" to Preclude Electronic Cards Violates Plaintiffs' Due Process Rights ................................................................................13

    E.   Plaintiffs Are Likely to Prevail on Their Claim That the Remaining Statutes in the Orders Are Inapplicable ................................................17

    F.   In Addition to the Likelihood of Prevailing on Their Claims, The Balance of Hardships Weighs Heavily in Favor of Granting This Motion .............18

        1.   Plaintiffs Face the Imminent Risk of Irreparable Injury for Which They Have No Adequate Remedy at Law. .....................................19

        2.   The Bureau Will Suffer No Hardship From Maintaining The Status Quo.............................................................................................20

        3.   The Public Interest Favors Issuance of a Temporary Restraining Order. ..........................................................................................20

IV.  CONCLUSION....................................................................................................21

# TABLE OF AUTHORITIES

**Page**

CASES

*Aguimitang v. California State Lottery,*
    234 Cal.App.3d 769 (1991) ...............................................................................1, 14

*Bay Area Addiction Research and Treatment, Inc. v. City of Antioch,*
    179 F.3d 725 (9th Cir. 1999) ...............................................................................11

*Bell Gardens Bicycle Club v. Cal. Dept. of Justice,*
    36 Cal. App. 4th 717 (1995) ...............................................................................14

*Black v. Dept. of Mental Health,*
    83 Cal. App. 4th 739 (2000) ...............................................................................10

*Cal. Gas. Retailers v. Regal Petroleum Corp.,*
    50 Cal. 2d 844 (1958) ...............................................................................14

*Caribbean Marine Serv. Co., Inc. v. Baldridge,*
    844 F.2d 668 (9th Cir. 1988) ...............................................................................20

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.,*
    840 F.2d 701 (9th Cir. 1998) ...............................................................................9

*Crowder v. Kitagawa,*
    81 F.3d 1480 (9th Cir. 1986) ...............................................................................11, 13

*CSX Transp., Inc. v. Easterwood,*
    507 U.S. 658 (1993)...............................................................................12

*Half Moon Bay Fishermans' Marketing Ass'n v. Carlucci,*
    857 F.2d 505 (9th Cir. 1988) ...............................................................................9

*In re Anthony P.,*
    84 Cal. App. 4th 1112 (2000) ...............................................................................10

*In re Quinn*
    35 Cal. App. 3d 473 (1973) ...............................................................................7

*Mills-Jennings of Ohio, Inc. v. Dept. of Liquor Control,*
    435 N.E.2d 407 (Ohio 1982) ...............................................................................16

*People v. 8,000 Punchboard Card Devices,*
    142 Cal.App.3d 618 (1983) ...............................................................................1, 4, 13, 14

*San Francisco Unified Sch. Dist. v. Johnson,*
    129 Cal. 3d 937 (1971)...............................................................................12

DLA PIPER US LLP

*EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

WEST\21418048.3

## TABLE OF AUTHORITIES
(continued)

Page

*South Dakota Farm Bureau v. Hazeltine,*
  202 F.Supp.2d 1020 (D.S.D. 2002) ..............................................................11, 12

*St. Mary's Catholic Church, et al. v. City of National City,*
  San Diego County Superior Court Case No. 563569 (Sept. 9, 1986).....................14

*State of Cal. v. Am. Stores Co.,*
  872 F.2d 837 (9th Cir. 1989) (rev'd on other grounds, 495 U.S. 271 (1990)............9

*State v. Pinball Machines,*
  404 P.2d 923 (Alaska 1965) ......................................................................15

*The Fund for Animals, Inc. v. Lujan,*
  962 F.2d 1391 (9th Cir. 1992) ....................................................................9

*Treasure State Games, Inc. v. State of Montana,*
  551 P.2d 1008 (Mont. 1976)...........................................................1, 15, 16

*Trinkle v. California State Lottery,*
  105 Cal. App. 4th 1401 (2003) ...................................................................17

*U.S. v. 103 Electronic Gambling Devices,*
  223 F.3d 1091 (9th Cir. 2000) ....................................................................16

*U.S. v. Odessa Union Warehouse Co-op,*
  833 F.2d 172 (9th Cir. 1987) .....................................................................20

*Western Telecon, Inc. v. California State Lottery,*
  13 Cal. 4th 475 (1996) .............................................................................17

FEDERAL STATUTES AND RULES

U.S. Const. Art. VI, cl. 2...............................................................................12

25 U.S.C. § 2703(7)(A) ................................................................................15

25 U.S.C. § 2703(7)(A)(i)(I)-(III)...................................................................15

25 U.S.C. § 2703(7)(A)(ii)............................................................................16

42 U.S.C. §§ 12131-65 ................................................................................10

42 U.S.C. § 12132 (2008) .......................................................................10, 11

Federal Rules of Civil Procedure, Rule 65 .........................................................1

DLA PIPER US LLP

WEST\21418048.3

# TABLE OF AUTHORITIES
## (continued)

Page

Federal Rules of Evidence, Rule 201.................................................................................15

**STATE STATUTES AND RULES**

California Constitution, art. I, § 7...................................................................................13

California Constitution, art. IV, § 19(c)...........................................................................3

California Evidence Code § 250.......................................................................................14

California Penal Code Title 9, Chapter 9.........................................................................17

California Penal Code Title 9, Chapter 10.......................................................................17

California Penal Code § 318.......................................................................................3, 18

California Penal Code § 321...........................................................................................18

California Penal Code § 325.......................................................................................3, 13

California Penal Code § 326.5..................................................................................passim

California Penal Code § 326.5(o)..............................................................................passim

California Penal Code § 330a............................................................................................3

California Penal Code § 330b...................................................................................17, 18

California Penal Code § 335a..........................................................................................13

California Penal Code § 337j(e)(1).................................................................................16

**OTHER AUTHORITIES**

58 Cal. Jur. 3d, Statutes sec. 111 (2004).......................................................................12

Alameda County General Ordinance Code § 3.12.010 ......................................................3

Alameda County General Ordinance Code § 3.12.020 ......................................................3

Sacramento County Code § 4.26 *et seq* .........................................................................3

Sacramento County Code § 4. 29 *et seq* ........................................................................3

S. Rep. No. 116, 101st Cong., 1st Sess. (1989) ..............................................................10

DLA PIPER US LLP

WEST\21418048.3

*EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1

*EX PARTE* **MOTION**

2     Plaintiffs Video Gaming Technologies, Inc., United Cerebral Palsy of Greater

3  Sacramento, WIND Youth Services, Robert Foss, and Joan Sebastiani (collectively, "plaintiffs"),

4  hereby move this Court for an *ex parte* temporary restraining order and an order to show cause

5  why a preliminary injunction should not issue pursuant to Rule 65 of the Federal Rules of Civil

6  Procedure.  Specifically, plaintiffs seek to enjoin and restrain defendants Bureau of Gambling

7  Control and Mathew J. Campoy, in his official capacity as the Acting Chief of the Bureau of

8  Gambling Control (collectively, the "Bureau"), and any other person and/or entity or agency

9  acting in concert or participation with the Bureau (including, but not limited to, the California

10 Attorney General and any other division or bureau of the California Department of Justice), from

11 enforcing various cease-and-desist orders issued by the Bureau on several charitable bingo

12 facilities in Alameda and Sacramento counties in May 2008.

13    These orders claim that electronic bingo aids manufactured by plaintiff Video Gaming

14 Technologies, Inc. ("VGT") in use at those facilities violate several state statutes relating to

15 lotteries and gaming.  In particular, the Bureau bases these orders largely on the Attorney

16 General's unlawful interpretation of the state bingo statute, Penal Code section 326.5, which

17 requires that prizes awarded in a game of bingo be based on a "card."  The Attorney General has

18 interpreted the term "card" to prohibit the use of electronic bingo aids that use electronic, as

19 opposed to paper or cardboard, bingo cards.  These orders threaten seizure of the electronic bingo

20 aids if they are not removed from their respective locations within 30 days of the respective

21 cease-and-desist order. ***The first of these orders is set to expire this Friday, June 6, 2008.***

22    This motion is made on the following grounds: (1) VGT's electronic bingo aids comply

23 with the state bingo statute (and the Bureau's unlawful interpretation of it) because they provide

24 paper bingo cards from which a winning pattern can be determined; (2) the Bureau's

25 interpretation of "card" to preclude the use of electronic cards discriminates against disabled

26 individuals in violation of the federal Americans with Disabilities Act; (3) the Bureau's restrictive

27 interpretation of "card" to prohibit electronic cards violates plaintiffs' due process rights; and (4)

28 the other statutes cited in the cease-and-desist orders are facially inapplicable.  In addition, the

DLA PIPER US LLP

-1-

*EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

WEST\21418048.3

1  balance of hardships weighs heavily in favor of plaintiffs because if injunctive relief is not

2  granted to preserve the status quo and allow VGT's electronic bingo aids to remain in operation

3  until a full trial on the merits of plaintiffs' claims, plaintiffs will suffer irreparable harm, including

4  the seizure of private property, a dramatic reduction in the ability of charitable organizations to

5  continue providing charitable services, and the inability of the individual disabled plaintiffs to

6  have equal access to charitable bingo.

7        This motion is based on this Motion, the accompanying Memorandum of Points and

8  Authorities, the Declarations of Alexander M. Medina, Steve Wilson, Doug Bergman, Robert

9  Eckstrom, Robert Foss, and Joan Sebastiani, all exhibits attached thereto, and on such other

10  evidence and argument as the Court may consider.

11       Defendants have been notified that this motion would be filed.  Plaintiffs will promptly

12  notify defendants of the date, time, and location of the hearing on this motion upon obtaining that

13  information from the Court.  (*See* Declaration of Alexander M. Medina, ¶ 7.)

14  Dated: June 2, 2008

15

16                              DLA PIPER US LLP

17                              By _____

18                              MATTHEW G. JACOBS
                                Attorney for Plaintiffs
19                              VIDEO GAMING TECHNOLOGIES, INC.,
                                UNITED CEREBRAL PALSY OF GREATER
20                              SACRAMENTO, WIND YOUTH SERVICES,
                                ROBERT FOSS, and JOAN SEBASTIANI

21

22

23

24

25

26

27

28

DLA PIPER US LLP

WEST\21418048.3

-2-

*EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.
### INTRODUCTION

By this motion, plaintiffs seek emergency injunctive relief to prevent the California Attorney General, Bureau of Gambling Control (the "Bureau") from seizing private property without justification, discriminating against the disabled, and eviscerating the major funding source for numerous charitable organizations, all on the basis of the Bureau's wrongly constrictive interpretation of a single word in the California bingo statute.

More specifically, in early May 2008, the Bureau served 30-day cease-and-desist orders on several Northern California bingo facilities. The cease-and-desist orders threaten immediate seizure and forfeiture of the bingo facilities' electronic bingo aids. The basis for the orders is the Bureau's claim that the aids violate the California bingo statute because they use electronic cards instead of "traditional" paper or cardboard cards. *The first of these 30-day deadlines expires this Friday, June 6, 2008.*

The Bureau's threatened action is illegal for a number of reasons. First and foremost, the electronic bingo aids at issue *do* provide paper cards, and thus comply with the California bingo statute and the Bureau's improperly restrictive interpretation of that statute.

Even were that not the case, however, the Bureau's assertion that electronic bingo cards do not qualify as bingo is flatly incorrect. California has only one bingo statute with only one definition of bingo: "a game of chance in which prizes are awarded on the basis of designated numbers or symbols on a card that conform to numbers or symbols selected at random. . . ." Pen. Code § 326.5(o) ("Section 326.5"). From that language, "No common meaning of the term bingo emerges." *People v. 8,000 Punchboard Card Devices*, 142 Cal.App.3d 618, 622 (1983). Thus, just as a "writing" refers to both paper and electronic media under California law (*Aguimitang v. California State Lottery*, 234 Cal.App.3d 769, 798 (1991) (a "writing" includes electronic data stored on a computer drive, such as e-mails)), so too does a "card" under Section 326.5 include electronic cards. *See, e.g., Treasure State Games, Inc. v. State of Montana*, 551 P.2d 1008, 1010-11 (Mont. 1976) (rejecting state Attorney General's opinion that electronic bingo cards are illegal

-1-

*EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1   under Montana's bingo law, which defines bingo virtually identically to the California statute).

2          The Bureau's limitation of bingo to a game played only on paper or cardboard would also

3   cause the California statute to discriminate against disabled people, in conflict with the

4   Americans with Disabilities Act ("ADA"). This is because electronic bingo aids allow disabled

5   people to play bingo on an equal footing with non-disabled people. Disabled people cannot

6   compete with non-disabled people if they are limited to the use of paper cards.

7          For at least these three reasons, the Bureau's interpretation of the word "card" in the

8   California bingo statute is wrong. If the Bureau is not enjoined from effectuating it, plaintiffs will

9   suffer irreparable harm: the charitable organization plaintiffs will suffer a severe drop-off in

10  revenue and a resulting decrease in their ability to provide critical social services; plaintiff Video

11  Gaming Technologies, Inc. ("VGT"), which manufactures the bingo aids in question, will suffer a

12  dramatic loss of income and the seizure of its property; and the individual disabled plaintiffs will

13  suffer discriminatory treatment under law, losing their freedom to engage in this form of

14  entertainment on an equal footing with their non-disabled peers. Plaintiffs' monetary losses

15  cannot later be recovered from the Bureau or the Attorney General.

16         By contrast, preserving the status quo will not harm the Bureau. No imminent harm will

17  befall the Bureau or the citizens of California if the Bureau is not permitted to effectuate its

18  interpretation of Section 326.5 immediately. In short, since the balance of hardships weighs

19  heavily on plaintiffs' side, the Court should enjoin the Bureau from effectuating its restrictive

20  interpretation of the California bingo statute pending a full trial on the merits of this action.

21                                          **II.**
                                   **FACTUAL BACKGROUND**
22

23  A.    **The Cease-and-Desist Orders**

24         In early May 2008, the Bureau personally served cease-and-desist notices on charitable

25  bingo facilities in Alameda and Sacramento Counties informing them that Bureau agents had

26  inspected electronic bingo "devices" at each facility and concluded that those devices violated

27

28

1  several statutes. (Declaration of Alexander M. Medina ("Medina Decl."), ¶ 2, Ex. A ("Orders").)[1]

2  Specifically, the Orders identified the make and model of what it termed "gaming devices" and

3  claimed that those devices violated Penal Code sections 318 (prevailing upon a person to visit a

4  place for gambling), 321 (illegal sale of lottery tickets), 326.5 (unlawful bingo devices), and 330b

5  (illegal slot machines). (*Id.*) The Bureau further stated that unless the identified devices were

6  removed within 30 days of each Order,[2] the Bureau would pursue further enforcement action,

7  including possible criminal prosecution and seizure of the devices and related proceeds under

8  Penal Code sections 325 and 330a. (*Id.*) The Orders were signed by defendant Mathew J.

9  Campoy, the acting chief of the Bureau.

10     These bingo facilities allow qualified charitable organizations, such as plaintiffs WIND

11  Youth Services ("WIND") and United Cerebral Palsy of Greater Sacramento ("UCP") to raise

12  critical funds by hosting bingo fundraiser events using electronic bingo aids. (Declaration of

13  Steve Wilson ("Wilson Decl."), ¶ 2.) Charities then in turn use funds obtained from the bingo

14  events to fund their programs. (*Id.*; Declaration of Doug Bergman ("Bergman Decl."), ¶ 3;

15  Declaration of Robert Eckstrom ("Eckstrom Decl."), ¶ 3.)

16  **B.   The California Bingo Law**

17     The California Constitution provides that "the Legislature by statute may authorize cities

18  and counties to provide for bingo games, but only for charitable purposes." Cal. Const. art. IV, §

19  19(c). Pursuant to this authority, the Legislature enacted Section 326.5 in 1976. It codifies the

20  Constitution's grant of authority to allow cities and counties to enact ordinances allowing

21  charitable bingo. Both Sacramento and Alameda Counties have enacted ordinances allowing for

22  the play of bingo pursuant to Section 326.5. Sacramento County Code §§ 4.26 *et seq.*, 4.29 *et*

23  *seq.*; Alameda County General Ordinance Code §§ 3.12.010, 3.12.020.

24

25  [1] The facilities at issue are Gilman Street Bingo in Berkeley (served May 12, 2008), the Sacramento Bingo Center in Sacramento (served May 7, 2008), the Mayhew Community Bingo

26  Center in Sacramento (served May 8, 2008), the North Watt Bingo Parlor in Sacramento (served May 8, 2008), and the Madison Mall Bingo Center in Sacramento (served May 8, 2008).

27  [2] Because the first Order was served on May 7, 2008, the 30-day period expires this

28  Friday, June 6, 2008.

1    Section 326.5 does not include a comprehensive definition of bingo, and is not designed to

2   do so.  Rather, it defines bingo as "a game of chance in which prizes are awarded on the basis of

3   designated numbers or symbols on a card that conform to numbers or symbols selected at

4   random. . . " (Pen. Code § 326.5(o)), and relies on the counties to determine whether to enact

5   ordinances to describe and allow charity bingo.[3]  There are no reported cases, state or federal,

6   interpreting the definition of "card" in Section 326.5(o).  Neither is there any definitive

7   interpretation of the term "bingo."  *8,000 Punchboard Card Devices* 142 Cal.App.3d at 622 ("No

8   common meaning of the term bingo emerges.").  Plaintiffs do not seek a comprehensive

9   interpretation of the bingo laws from this Court.  Rather, the relief requested is simply to protect

10   plaintiffs from the Bureau's specific, unlawful interpretation that is actually at issue in this case.

11   **C.    The Plaintiffs in This Case[4]**

12    VGT manufactures electronic bingo aids for use in charitable bingo games in Northern

13   California. (Wilson Decl., ¶ 2.)  As stated in greater detail below, VGT manufactured and

14   supplied the vast majority of the electronic bingo aids identified in the Orders.  (*Id.*, ¶ 3.)

15    UCP is a 501(c)(3) charity whose mission is to provide programs and services that

16   improve the independence, productivity, and quality of life of people with cerebral palsy and

17   other developmental disabilities and their families. (Bergman Decl., ¶ 2.)  UCP was founded in

18   1955 and now runs 13 different programs that serve more than 1,400 individual clients.  (*Id.*)

19   UCP derives substantial and important revenues from regular bingo fundraisers that it holds at

20   bingo facilities in the Sacramento area. (*Id.*, ¶ 3.)  One of UCP's important programs is "Saddle

21   Pals," which is a therapeutic horsemanship program that provides services to individuals with

22   physical or developmental disabilities. (*Id.*, ¶ 8.)  The program began in 1993 and is accredited

23   through the North American Riding for the Handicapped Association.  (*Id.*)  Saddle Pals relies

24   almost exclusively on funding from UCP's bingo fundraisers.  (*Id.*)

25

26    [3] The remainder of Section 326.5(o) identifies the necessary characteristics of a related

27   form of bingo, "punchboards," which are not at issue here.

28    [4] *See* Complaint, ¶¶ 49-50 for further standing allegations.

1      WIND is a 501(c)(3) corporation that serves the immediate and long-range needs of

2   homeless youth in Sacramento County. (Eckstrom Decl., ¶ 2.) WIND relies on revenue obtained

3   from regular bingo fundraisers played exclusively with VGT's electronic bingo aids in order to

4   fund its numerous programs. (Id., ¶ 3.)

5      Robert Foss is a 68-year-old Sacramento resident who has been legally blind since 2002.

6   (Declaration of Robert Foss ("Foss Decl."), ¶ 2.) For approximately three years, Mr. Foss has

7   been active with the Society for the Blind ("SFB"), first being trained in non-sighted living skills,

8   then training and mentoring other blind people himself. (Id., ¶ 3.) For at least one year, Mr. Foss

9   has been volunteering at least four days a week to help SFB run its charitable bingo games at the

10  Sacramento Bingo Center and to host guests who come to play. (Id., ¶ 4.) Mr. Foss also enjoys

11  competing in bingo games on VGT electronic bingo aids, and has encountered other blind people

12  doing the same. (Id., ¶ 5.) These electronic bingo aids allow him and other blind and low-vision

13  individuals to effectively compete at bingo with sighted individuals. (Id., ¶ 6.) He is unable to

14  compete equally with sighted individuals by using only paper bingo cards, and is even at a

15  disadvantage with Braille bingo cards or other cards with raised numbers or other tactile-

16  functions, since he is not able to locate squares with called numbers or identify winning bingo

17  patterns quickly enough to win. (Id., ¶ 8.)

18     Joan Sebastiani is a 65-year-old Sacramento resident who has been completely paralyzed

19  on the left side of her body since suffering a stroke in 1994. (Declaration of Joan Sebastiani

20  ("Sebastiani Decl."), ¶¶ 1-2.) She lives in an assisted living facility, and uses a wheelchair to get

21  around. (Id., ¶ 2.) Ever since the Sacramento Bingo Center opened in approximately May 2007,

22  Ms. Sebastiani has been attending bingo there about four or five times a month, for a few hours at

23  a time. (Id., ¶ 3.) She is only able to play bingo using electronic bingo aids. (Id., ¶ 5.) She

24  cannot play bingo using only paper cards, due to her disability, because she cannot manipulate,

25  locate, or daub squares with called numbers, or identify winning bingo patterns and call them out

26  quickly enough to win in an "all paper" bingo game. (Id.) The electronic bingo aids allow her to

27  compete in bingo games against able-bodied individuals. (Id.)

28

## D.    VGT's Electronic Bingo Aids

The Orders identify a total of 303 electronic bingo aids that the Bureau contends are unlawful. Of these 303, 286 were manufactured by VGT and provided to the respective locations for their use in charitable bingo games. (Wilson Decl., ¶ 3.) Until recently, VGT's electronic bingo aids operated as follows: A player pays the clerk (a member of a charitable organization volunteering his or her time) a certain amount of money for the purchase of electronic bingo cards to be played on an electronic bingo aid. (*Id.*, ¶ 5.) The clerk gives the player a receipt with a code on it. (*Id.*) The player inserts that code into an electronic bingo aid, which then recognizes the code and gives the player a certain amount of credits for the purchase of electronic bingo cards on that particular bingo aid. (*Id.*) A player may play only one card per game. (*Id.*) The clerk may assist a blind or otherwise disabled person who cannot input the code. (*Id.*)

The electronic cards contain columns and rows with numbers. All players must obtain their bingo cards before a game starts. (*Id.*, ¶ 6.) Each of the electronic bingo aids link into a common game, which cannot begin until at least two players are present. (*Id.*, ¶ 7.) Once the game begins, a centralized common random number generator draws the numbers, which are in turn displayed on the screen of each electronic bingo aid in real time and in the sequence drawn (*i.e.*, the winning pattern is not known before a game begins). (*Id.*) After this initial draw, the player must then "daub" (or cover) the matching numbers on the electronic cards by pressing a button on the bingo aid. (*Id.*, ¶ 8.) If a player does not press the daub button, then he or she "sleeps" those numbers such that they are not counted toward a winning pattern for that player. (*Id.*) Once a player obtains a winning pattern, he or she must be the first person in the game to press his or her button to "call" bingo. (*Id.*) If a player has a winning pattern but does not press the button, then he or she "sleeps" the win and another player with a winning pattern can subsequently call bingo and win. (*Id.*)

Neither the charitable organization nor any other entity has any interest in the outcome of the game, and there must always be a winner for every game. (*Id.*, ¶ 9.) As such, the game continues and numbers continued to be called until there is a winner. (*Id.*) Additionally, the player has the option of printing a paper copy of each bingo card used in a particular game. (*Id.*,

1   ¶ 10.) Whether the player has won or not can be determined on the basis of the paper alone. (*Id.*)

2          On May 28, 2008, or about three weeks after the first of the Orders was served, VGT

3   began changing the software on all of its electronic bingo aids operating in Alameda and

4   Sacramento Counties, in an effort to ensure that the electronic bingo aids comply with even the

5   Bureau's restrictive interpretation of Section 326.5. (*Id.*, ¶ 11.) This new software ensures that

6   paper cards are an integral and necessary component of the game in that they are purchased and

7   received by a player prior to playing bingo with a VGT electronic bingo aid. (*Id.*, ¶ 12.) Each

8   electronic bingo aid is programmed with only one electronic card. (*Id.*, ¶ 12.) When a player

9   chooses to play at a particular electronic bingo aid, he or she will be given a booklet containing

10  the entire library of corresponding paper cards with matching reference numbers so that the

11  player can locate the paper card corresponding to the electronic bingo aid. (*Id.*) If the player

12  decides that he or she wishes to use a different card, then he or she must move to a different bingo

13  aid. (*Id.*) The player can verify whether he or she has won based solely on the paper card. (*Id.*;

14  *see also* Ex. A (sample paper bingo cards).) In all other respects, the new version of VGT's

15  electronic bingo aids operate the same way the earlier versions did. (*Id.*, ¶ 12.)

16  **E.      The Bureau's Interpretation of Section 326.5 and Its Refusal to Withdraw the Orders**

17         The Orders are based on the Attorney General's specific, unlawful interpretation of the

18  term "card" in Section 326.5(o) as being limited to cards made of paper or cardboard and

19  prohibiting VGT's electronic bingo aids. More specifically, in August 2007, the Attorney

20  General issued a "Law Enforcement Advisory" addressing the issue of bingo played with

21  electronic aids. (Medina Decl., ¶ 3, Ex. B ("Aug. 10, 2007 Advisory").) In that advisory, the

22  Attorney General concluded, in reliance on his own 1987 and 1998 opinions, that any form of

23  bingo not played with "traditional bingo cards," *i.e.*, those made of paper or cardboard, is

24  unlawful. (*Id.*, pp. 1-3.)[5] The Advisory did find, however, that electronic bingo aids comply with

25  Section 326.5 so long as traditional bingo cards are used as well. (August 10, 2007 Advisory,

26

27         [5] These opinions have no precedential value. *See, e.g., In re Quinn* 35 Cal. App. 3d 473

28  (1973), 482 ("Opinions of the Attorney General are not binding on this court.").

DLA PIPER US LLP

WEST\21418048.3        *EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
                       MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1   p. 3.)

2       Even though VGT believes that its original electronic bingo aids complied with Section

3   326.5, after receiving the Orders, VGT worked to convince the Bureau to "stand down" from

4   enforcing the Orders against VGT's bingo aids. Most significantly, VGT made the software

5   changes to its electronic bingo aids described above in an effort to ensure that they would comply

6   with even the strictest interpretation of the term "card." (Wilson Decl., ¶ 11.) Those changes

7   were expensive, as VGT had to develop, test, and install new software for each of its electronic

8   bingo aids in Sacramento and Alameda Counties to conform to the Bureau's interpretation of the

9   statute. (*Id.*, ¶ 13.)

10      VGT has also met and corresponded with the Bureau and the Attorney General on several

11  occasions to inform them of the changes to VGT's electronic bingo aids in an attempt to

12  demonstrate that those aids comply with the Bureau's (unlawful) interpretation of Section 326.5.

13  (Declaration of Harlan Goodson ("Goodson Decl."), ¶¶ 6-10.) Despite these efforts, the Bureau

14  has refused to withdraw the Orders, and has threatened to seize the machines as early as this

15  coming Friday based solely on a visual assessment of the electronic bingo aids at each bingo

16  facility, even though the changes to those aids are largely technical in nature. (*Id.*, ¶ 10.)

17  Plaintiffs thus fear that the Bureau lacks the technical expertise to adequately evaluate the newly-

18  configured electronic bingo aids and that it will seize the aids and shut down the bingo facilities

19  solely on the basis of the aids' appearance. (*Id.* ¶ 11.)

20                              **III.**
                            **ARGUMENT**
21

22      Plaintiffs seek to enjoin the Bureau from enforcing the Orders on three grounds: (1)

23  VGT's electronic bingo aids comply with Section 326.5(o) because they provide paper bingo

24  cards from which a winning pattern can be determined; (2) the Bureau's interpretation of "card"

25  to preclude the use of electronic cards discriminates against disabled individuals in violation of

26  the ADA; and (3) the Bureau's restrictive interpretation of "card" to preclude the use of electronic

27  cards violates plaintiffs' due process rights. In addition, the other statutes the Bureau cites in its

28  Orders as a basis for seizing VGT's aids are facially inapplicable.

DLA PIPER US LLP
                                    -8-
WEST\21418048.3        *EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
                       MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

A.    **Legal Standards for Injunctive Relief**

The purpose of temporary injunctive relief is to preserve the status quo until a court determines the underlying action on its merits. *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1998). To support the issuance of a preliminary injunction, plaintiffs must demonstrate either: "(1) a likelihood of success on the merits and a possibility of irreparable injury, or (2) the existence of serious questions on the merits and a balance of hardships tipping in its favor." *The Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992) (citing *Half Moon Bay Fishermans' Marketing Ass'n v. Carlucci*, 857 F.2d 505, 507 (9th Cir. 1988)). These are not distinct legal standards, but rather represent two points on a continuum. *State of Cal. v. Am. Stores Co.*, 872 F.2d 837, 840-41 (9th Cir. 1989) (rev'd on other grounds, 495 U.S. 271 (1990)). Where the balance of hardship decidedly favors the plaintiff, a lesser showing of likelihood of success on the merits is required; where the probability of success on the merits is high, only the possibility of irreparable injury need be shown. *Id.* A case involving issues of public interest also requires a court to consider whether the public interest favors the plaintiff. *Id.*

B.    **Plaintiffs Are Likely to Prevail on Their Claim That VGT's Electronic Bingo Aids Comply With Even the Bureau's Unlawful Interpretation of Section 326.5 Because They Provide Paper Cards.**

Simply stated, the Orders should not be enforced against VGT's electronic bingo aids because they comply with the plain language of Section 326.5 *and* even with the Bureau's unlawful and restrictive interpretation of that statute. Section 326.5(o) does not require that bingo actually be *played* on a card, but rather requires that "prizes [be] awarded on the basis of designated numbers or symbols on a card that conform to numbers or symbols selected at random." In other words, even if "card" means paper or cardboard only, the game must merely allow the player to verify a winning pattern on a paper or cardboard card to comply with the statute.

As shown above, both the old and new versions of VGT's electronic bingo aids satisfy this requirement. Before VGT's recent software change, players had the option of printing a paper copy of that player's cards for a particular game. (Wilson Decl., ¶ 10.) Each player could determine whether he or she had won or lost from that paper alone. (*Id.*) The current software

*EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1   provides papers cards to each player in advance. (*Id.*, ¶ 12.) Thus under both the old and new

2   versions of VGT's electronic bingo aids, a winning card may be verified from the paper cards

3   alone, and, consistent with Section 326.5(o), prizes are awarded "*on the basis* of designated

4   numbers or symbols on a card that conform to numbers or symbols selected at random." Pen.

5   Code § 326.5(o) (emphasis added).

6       Hence even under the most restrictive interpretation of the term "card," plaintiffs have

7   demonstrated a likelihood that they will prevail on their claim that VGT's electronic bingo aids

8   comply with Section 326.5.

9   **C.   Plaintiffs Are Likely to Prevail on Their Claim That the Bureau's Interpretation of Section 326.5 Violates Federal Law Because It Discriminates Against Disabled Individuals.**

10

11      Separate and independent of their claim that the bingo aids in question actually comply

12   with the Bureau's restrictive reading of the California bingo statute, plaintiffs are likely to prevail

13   on their claim that that specific interpretation violates the ADA.

14      **I.   Overview of ADA**

15      Congress passed the ADA to "bring individuals with disabilities into the economic and

16   social mainstream of American life." S. Rep. No. 116, 101st Cong., 1st Sess., at 58 (1989). Title

17   II of the ADA, 42 U.S.C. §§ 12131-65, prohibits discrimination on the basis of disability by

18   public entities, including in the enactment and enforcement of state laws.[6] ADA § 12132

19   provides:

20          Subject to the provisions of this subchapter, no qualified individual
            with a disability shall, by reason of such disability, be excluded
21          from participation in or be denied the benefits of the services,
            programs, or activities of a public entity, or be subjected to
22          discrimination by any such entity.

23   42 U.S.C. § 12132 (2008). Section 12132 thus constitutes a general prohibition against

24   discrimination by public entities. This prohibition does not allow public entities to enact

25

26      [6] Title II of the ADA incorporates the enforcement provisions of the Rehabilitation Act,
    and case law construing the Rehabilitation Act provides guidance in construing the ADA. *In re*
27   *Anthony P.*, 84 Cal. App. 4th 1112, 1116.(2000); *Black v. Dept. of Mental Health*, 83 Cal. App.
    4th 739, 749 (2000).

28

DLA PIPER US LLP

*EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

WEST\21418048.3

1    discriminatory statutes, or to interpret and enforce them in a discriminatory manner (*see Crowder*

2    *v. Kitagawa*, 81 F.3d 1480, 1483 (9th Cir. 1986)), subject to the provisions of Title II of the

3    ADA. This protection of the disabled applies regardless of the subject matter of the statute. *See*

4    *id.* at 1483-84.

5         Federal courts have consistently held that the proscriptions of Title II of the ADA apply to

6    laws and ordinances enacted by state and local governments. For example, in *Bay Area Addiction*

7    *Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730-32 (9th Cir. 1999), the Ninth

8    Circuit found that Title II of the ADA prohibits discrimination against disabled individuals in city

9    zoning ordinances, even though zoning "is a traditionally local activity." *Id.* at 732 (citations

10   omitted). Further, in *South Dakota Farm Bureau v. Hazeltine*, 202 F.Supp.2d 1020 (D.S.D.

11   2002), the Court cited the federal regulations and found that:

12              Title II applies to anything a public entity does. Title II coverage,
               however, is not limited to "executive" agencies, but includes
13              activities of the legislative and judicial branches of State and local
               governments.
14

15   *Id.* at 1041. Therefore, any law enacted by the California Legislature (and any interpretation of

16   that law) enforced by the Attorney General must comply with the ADA, even if the law governs

17   an area traditionally under state control.

18         In enacting § 12132 of the ADA, Congress intended to prohibit both outright

19   discrimination and insidious discrimination that denies disabled persons services

20   disproportionately due to their disability. *Crowder*, 81 F.3d at 1483. In other words, Congress

21   intended to prohibit "disparate impact" instances of discrimination by "facially neutral" laws. *Id.*

22   In *Crowder*, the Ninth Circuit considered Hawaii's "facially neutral" law requiring a 120-day

23   quarantine for all dogs entering the state. *Id.* Even though the law was enacted to protect the

24   health and safety of the State's residents and animals, the Court found that the manner of

25   enforcement of that law "burden[ed] visually-impaired persons in a manner different and greater

26   than it burden[ed] others. . . . The quarantine, therefore, discriminate[d] against the plaintiffs by

27   reason of their disability." *Id.* at 1484.

28

-11-

*EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1        **2.    As Written and Enforced Section 326.5 Must Comply With the ADA.**

2        Any state law or constitutional provision that conflicts with federal law is preempted

3    under the federal Constitution's Supremacy Clause.  U.S. Const. Art. VI, cl. 2; *see also CSX*

4    *Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993) ("Where a state statute conflicts with, or

5    frustrates, federal law, the former must give way."); *South Dakota Farm Bureau*, 202 F. Supp. 2d

6    at 1042.  As such, statutes must be construed to preserve their constitutionality, whenever

7    feasible, within the bounds set by their words and purpose.  *San Francisco Unified Sch. Dist. v.*

8    *Johnson,* 129 Cal. 3d 937, 942 (1971); 58 Cal. Jur. 3d, Statutes sec. 111 (2004), and cases cited

9    therein.  "The beginning premise of any determination regarding the constitutionality of a statute

10    is an assumption of its validity, and where two alternative statutory interpretations are presented,

11    one unconstitutional and the other constitutional, the court will choose the construction that

12    upholds the validity of the statute."  *Id.*

13        This guiding rule of interpretation is, of course, binding on the Attorney General just as it

14    is binding on the Courts.  Here, the Attorney General has violated that principle by seeking to

15    enforce an interpretation of Section 326.5 that would discriminate against disabled individuals,

16    claiming that only paper or cardboard cards are allowed under that statute.

17        Just one reason why the Bureau's interpretation is wrong is that it would burden disabled

18    individuals in a manner differently and greater than it would burden non-disabled persons, thus

19    violating the ADA.  More specifically, under the Bureau's interpretation, disabled individuals,

20    such as plaintiffs Mr. Foss and Ms. Sebastiani, will be denied equal access to charitable bingo

21    while non-disabled players will be able to continue playing as before.  (Foss Decl., ¶¶ 7-8;

22    Sebastiani Decl., ¶ 7.)  Paper or cardboard bingo cards do not allow these plaintiffs the same

23    "meaningful access" to charitable bingo afforded to non-disabled Californians.  (*Id.*)  This is

24    because their disabilities make it difficult, if not impossible, to manually daub paper bingo cards.

25    (*Id.*)  And even if these plaintiffs could manually daub, they could not do so on the appropriate

26    spots on multiple paper bingo cards as quickly as their non-disabled counterparts, placing them at

27    a distinct disadvantage.  (*Id.*)  In other words, manual, paper bingo simply is not an option for

28    them.  (*Id.*)

1      On the other hand, VGT's electronic bingo aids allow equal access to charitable bingo for

2   the disabled and non-disabled alike.  The ability to daub one's card with the push of a button

3   places the disabled person on equal footing with all players, whether games are played with

4   multiple cards as they were with the old version of VGT's software, or with one card under the

5   new software.  (Foss Decl., ¶ 5; Sebastiani Decl., ¶ 5.)  The Bureau's interpretation of Section

6   326.5 would thus violate the ADA through the disparate impact it would have on disabled bingo

7   players, rendering the statute unconstitutional.  *See Crowder*, 81 F.3d at 1483-84.  The Bureau's

8   interpretation must therefore be rejected and prohibited.

9      By contrast, plaintiffs' interpretation of Section 326.5 would allow the statute to

10  peacefully coexist and comply with the ADA and, therefore, the Supremacy Clause.  This is just

11  one more reason why plaintiffs' interpretation that "bingo card" includes electronic cards is

12  correct, and why plaintiffs are likely to prevail on their claims.

13  **D.    Plaintiffs Are Likely to Prevail on Their Claim That the Bureau's Interpretation of**
        **"Card" to Preclude Electronic Cards Violates Plaintiffs' Due Process Rights.**
14

15     The Fifth and Fourteenth Amendments to the United State Constitution, as well as Article

16  I, section 7 of the California Constitution, preclude any person from being deprived of "life,

17  liberty, or property, without due process of law."  Yet the Bureau is poised to abrogate those

18  rights based solely on its unilateral interpretation of the term "card" by seizing VGT's bingo aids

19  and shutting down California charitable bingo facilities without a trial to determine whether the

20  bingo aids are the types of devices that the Bureau may seize in the first place.  (*See* Orders

21  (citing Penal Code §§ 325 and 335a as grounds for seizure, which, facially, allow for the seizure

22  of illegal lottery devices or slot machines without a final judgment).)

23     The Bureau's interpretation of "card" is erroneous.  Section 326.5(o) merely states that

24  bingo is played on a "card."  California law contains no further definition of that term, either by

25  statute or reported case.

26     In fact, in a remarkably similar context, a California court rejected the government's

27  argument that the term "bingo" in the California bingo statute was restricted to the "traditional"

28  form of that game.  In *8,000 Punchboard Card Devices, supra*, the Alameda County District

DLA PIPER US LLP

-13-

*EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1  Attorney argued that the amendment to Section 326.5 allowing "punchboard" bingo was

2  unconstitutional because the electorate intended, in amending the California Constitution, that the

3  definition of the term "bingo" should be "traditionally understood," which, according to the

4  District Attorney, involves only "drawing numbers at random and covering spaces on a card."

5  142 Cal. App. 3d at 621.

6      The court disagreed, holding that no such limitation could be read into the Constitution

7  because the term "bingo" is "doubtful or obscure," and "capable of several interpretations." *Id.* at

8  620-21. The court thus rejected the notion of a "traditional" definition of bingo because it found

9  that term to include any number of different but related games played in a variety of formats

10  (such as raffles, spinning wheels, and even dominoes). *Id.* at 620-621, 622. The court ultimately

11  concluded, "No common meaning of the term bingo emerges." *Id.* at 622.

12      The inquiry is thus not "traditional" versus "non-traditional" bingo, but whether the game

13  itself complies with the relevant statutes. *See Bell Gardens Bicycle Club v. Cal. Dept. of Justice*,

14  36 Cal. App. 4th 717, 744 (1995) (citing *Cal. Gas. Retailers v. Regal Petroleum Corp.*, 50 Cal. 2d

15  844, 859 (1958)). As shown above, VGT's electronic bingo aids are just bingo games played on

16  a computer screen. The nature of the electronically-aided game is identical to a game played with

17  paper cards, such as the element of competition among multiple players, randomly-selected

18  numbers that correspond to pre-determined patterns on the electronic cards, and the requirement

19  that the house never wins. (*See* Section II(D), *supra*.)

20      In short, the specific media on which the game is played is of no import. We are long past

21  the day of distinguishing between tangible, "hard" media and its "softer" counterparts for legal

22  purposes. Just as the term "writing," traditionally understood to refer to paper only, now includes

23  both paper and electronic media under California law (Evid. Code § 250; *see also Aguimitang v.*

24  *California State Lottery*, 234 Cal. App. 3d 769, 798 (1991) (a "writing" includes electronic data

25  stored on a computer drive, such as e-mails)), so too does "card" include both paper and

26  electronic formats.

27      Although there are no reported California cases on point, other courts have adopted a

28  similar view of electronic bingo cards. In *St. Mary's Catholic Church, et al. v. City of National*

DLA PIPER US LLP

-14-

*EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1   *City*, San Diego County Superior Court Case No. 563569 (Sept. 9, 1986), the court issued a

2   Statement of Decision after a court trial, holding that the plaintiff's electronic bingo device

3   constituted a "card" within the meaning of Section 326.5. (Medina Decl., ¶ 4, Ex. C ("Statement

4   of Decision"), p.2.)[7] More specifically, the court found that the devices at issue, which used

5   electronic representations of bingo cards, "result[] in the playing of bingo as intended by the body

6   of law authorizing this game in California." (*Id.*, pp. 2-3.); *see also Treasure State Games, Inc. v.*

7   *State of Montana*, 551 P.2d 1008, 1010-11 (Mont. 1976) (rejecting state Attorney General's

8   opinion that electronic bingo cards are illegal under Montana's bingo law, which defines bingo

9   virtually identically as the California statute); *State v. Pinball Machines*, 404 P.2d 923, 924

10   (Alaska 1965), *passim* (referring to an electronic representation of a bingo card on a pinball

11   machine as a "bingo card" throughout).

12         Moreover, there exists a large body of law relating to the interpretation of bingo under the

13   federal Indian Gaming Regulatory Act ("IGRA"). Specifically, bingo is classified as a "Class II"

14   game under IGRA (as opposed to a Class III game, such as a slot machine), with electronic cards

15   explicitly permitted. 25 U.S.C. § 2703(7)(A)(i)(I)-(III).[8] So long as an electronic bingo aid

16

17        [7] Plaintiffs request that the Court take judicial notice of the Statement of Decision, which
is attached as Exhibit C to the Medina Decl., pursuant to Rule 201 of the Federal Rules of
Evidence.

18

19        [8] Section 2703(7)(A) provides, in pertinent part:
       The term "class II gaming" means—

20
             (i) the game of chance commonly known as bingo (*whether*
21         *or not electronic, computer, or other technologic aids are used in*
           *connection therewith*)--
22             (I) which is played for prizes, including monetary
           prizes, with cards bearing numbers or other designations,
23             (II) in which the holder of the card covers such
           numbers or designations when objects, similarly numbered or
24         designated, are drawn *or electronically determined*, and
             (III) in which the game is won by the first person
25         covering a previously designated arrangement of numbers or
           designations on such cards, including (if played in the same
26         location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and
           other games similar to bingo. . . .
27

28   (emphasis added).

*EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    requires at least two players and players play against each other, not the house, that device is a

2    permissible Class II game under IGRA, not an impermissible "electronic facsimile" of a game of

3    chance. 25 U.S.C. § 2703(7)(A)(ii); *U.S. v. 103 Electronic Gambling Devices*, 223 F.3d 1091,

4    1099-1101 (9th Cir. 2000).[9]

5         · Furthermore, in direct contravention to its current position, the California Attorney

6    General has previously opined that games played with electronic representations of cards are

7    equivalent to playing the games with physical cards. More specifically, the Attorney General was

8    asked in 1983 to analyze whether a video poker machine was an illegal slot machine. (Medina

9    Decl., ¶ 5, Ex. D ("Sep. 15, 1983 Attorney General Opinion").)  Poker is defined as a "controlled

10   game . . . played with cards." Pen. Code § 337j(e)(1).  Similar to Section 326.5(o), the term

11   "card" is not defined in the Section 337j(e)(1).  Although the Attorney General concluded that the

12   video poker machine at issue was not a slot machine, he nonetheless found that the game being

13   played on the machine was properly considered poker *even though the machine used only*

14   *electronic representations of cards, not actual playing cards.*  (*Id.*, pp. 7-8.)

15        In so finding, the Attorney General adopted the reasoning of *Mills-Jennings of Ohio, Inc.*

16   *v. Dept. of Liquor Control*, 435 N.E.2d 407 (Ohio 1982), and *Treasure State Games, supra*, with

17   the former holding that since poker is a game of chance under the Ohio statute, poker played on a

18   machine is also a game of chance, and the latter holding that electronic bingo is equivalent to

19   non-electronic bingo.  (*Id.*, p. 5, and citing *Mills-Jennings*, 435 N.E.2d at 408 ("Whether the game

20   being played is on a video screen or on a card table makes no real difference.") and *Treasure*

21   *State Games*, 551 P.2d at 1008.)

22        In short, numerous courts, the California Legislature, the United States Congress, and

23   even the California Attorney General, all believe that an electronic representation of a tangible

24   item is equivalent to the item itself.  Plaintiffs have thus shown a likelihood of success on the

25

26        [9] It is notable that, in refusing to withdraw the Orders, defendant Campoy instructed VGT
27   to refer to the Class II standards to determine how to ensure that its electronic bingo aids will not
     be found unlawful. (*See* Goodson Decl., ¶ 5.) Those standards, as just shown, support plaintiffs'
28   position.

*EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

WEST\21418048.3

1    merits of their claim that defendants must be enjoined from enforcing an interpretation of Section

2    326.5 that prohibits electronic bingo cards.

3    **E.    Plaintiffs Are Likely to Prevail on Their Claim That the Remaining Statutes in the
         Orders Are Inapplicable.**

4

5    In addition to threatening seizure under Section 326.5, the Orders also threaten seizure

6    under Penal Code section 330b ("Section 330b").  Section 330b essentially prohibits the

7    possession or use of slot machines in California, with some exceptions for tribal gaming

8    activities.  But the two sections are mutually exclusive such that if a game or device is determined

9    to fall within the statutes governing lotteries under Title 9, Chapter 9 of the Penal Code (of which

10   Section 326.5 is a part), then the statutes governing gaming under Title 9, Chapter 10 (of which

11   Section 330b is a part) are inapplicable.  *Trinkle v. California State Lottery*, 105 Cal. App. 4th

12   1401, 1406 (2003) ("California law has long distinguished between lotteries and other forms of

13   illegal gambling, treating gaming, betting, and lotteries as 'separate and distinct things in law and

14   fact. . . .'  [¶]  While some. . . games resemble some forms of lottery, these two categories of

15   gambling [gaming and lotteries] are *mutually exclusive* of one another. . . .") (quoting *Western*

16   *Telecon, Inc. v. California State Lottery*, 13 Cal. 4th 475, 484 (1996) (emphasis in original, other

17   quotations omitted)).

18   In other words, if the electronic bingo aids are not prohibited by Section 326.5, then they

19   are a lawful version of a lottery and cannot, by definition, be slot machines.  As shown above,

20   plaintiffs have demonstrated a likelihood of success on their claim that the electronic bingo aids

21   are not prohibited by Section 326.5.  By extension, the Bureau should be precluded from

22   enforcing the Orders under Section 330b.[10]

23

_____

24   [10] Moreover, the electronic bingo aids are not slot machines because a slot machine, by
     definition, allows the house to win with no competition among other players.  *See* Pen. Code §
25   330b; *Trinkle*, 105 Cal. App. 4th at 1406-1407, 1410-1411; *Western Telecon, Inc. v. Cal. State*
     *Lottery*, 13 Cal. 4th 475, 484-85 (1996).  With electronic bingo aids, on the other hand,
26   competition is the name of the game, as games cannot be played without at least two players, one
27   of whom *must* win.  Because the electronic bingo aids are not slot machines, the Bureau cannot
     enforce the Orders against them on the basis that they are.  Indeed, even defendant Campoy, the
28   Acting Chief of the Bureau (and the one who signed the Orders), apparently believes that "the

WEST\21418048.3

*EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    The remaining two statutes identified in the Orders do not apply here either. Those

2    statutes, Penal Code sections 318 and 321, are tied to a finding that the electronic bingo aids are

3    illegal gambling devices. For instance, Section 318 makes it a misdemeanor if one "prevails upon

4    any person" to visit a place "kept for the purpose of illegal gambling." But if there is no illegal

5    gambling at a particular location, then the statute is inapplicable on its face. That is the case here,

6    as the electronic bingo aids comply with Section 326.5 and are not slot machines.

7        Similarly, Section 321 prohibits the sale of lottery tickets. As charitable bingo is an

8    exception to the general prohibition on lotteries under Title 9, Chapter 9 of the Penal Code, the

9    Bureau's theory is apparently that if the electronic bingo aids do not comply with Section 326.5,

10   then they are instruments of an illegal lottery. But, as shown above, the bingo aids are compliant

11   with Section 326.5 and thus do not constitute lottery devices.

12       In short, neither Section 330b, 318 or 321 permits the unconstitutional seizure threatened

13   in the Orders.

14   F.    **In Addition to the Likelihood of Prevailing on Their Claims, The Balance of Hardships
         Weighs Heavily in Favor of Granting This Motion.**

15

16       Plaintiffs have established above that they are likely to prevail on their claims at trial, the

17   first factor in determining whether their motion for an injunction should be granted. The second

18   factor – the balance of hardships – weighs at least as strongly in favor of plaintiffs, since the

19   Bureau's threatened enforcement action will devastate plaintiffs' property and liberty interests

20   immediately (with no possibility of compensation later), while maintaining the status quo harms

21   the Bureau not at all.

22       1.    **Plaintiffs Face the Imminent Risk of Irreparable Injury for Which They Have
              No Adequate Remedy at Law.**

23

24       The Bureau has stated unambiguously that as soon as this Friday, June 6, 2008, it will

25   "pursue such enforcement action as may be necessary, including but not limited to, seizing the

26   unlawful gambling devices and associated unlawful proceeds and criminal prosecution of the

27   machines used by bingo parlors are not slots. . . ." (Medina Decl., ¶ 6, Ex. E (Contra Costa Times
     article quoting Mr. Campoy).)

28

1    offender." (Orders.) Were that to occur, the charitable organization plaintiffs would suffer a

2    severe reduction in revenue and a resulting decrease in their ability to deliver social services;

3    VGT would suffer a dramatic loss of income and the seizure of its property without due process;

4    and the individual disabled plaintiffs would lose their freedom to engage in this form of

5    entertainment on an equal footing with their non-disabled peers. Although VGT recently

6    replaced the software on its electronic bingo aids to ensure that they comply with even the

7    strictest interpretation of Section 326.5(o), the Bureau has not withdrawn its Orders, and thus the

8    threat of seizure continues.

9           As for WIND and UCP, their inability to host bingo fundraisers, even for a short time,

10    would substantially reduce their revenue. (Eckstrom Decl. ¶ 6; Bergman Decl., ¶ 8.) This is

11    likely to cause them to have to slash or eliminate their charitable programs, which deliver scarce

12    social services to their very needy constituencies. (*Id.*) The loss of revenue to UCP could even

13    lead to its closure. (Bergman Decl., ¶ 8.)

14           VGT would also lose significant revenue from the sale of bingo cards to the charities and

15    the possible seizure and destruction of its equipment. (Wilson Decl., ¶ 17.) Like the charities'

16    loss of revenue from charitable bingo, this harm to VGT is also irreparable because it would not

17    be recoverable through damage awards against the Bureau later.

18           In addition, if disabled individuals cannot use electronic bingo aids, they cannot play

19    charitable bingo competitively. Many disabled individuals, including Mr. Foss and Ms.

20    Sebastiani, greatly enjoy the activity of charitable bingo and intend to continue playing so long as

21    the tools needed for them to compete – electronic bingo aids — remain available to them. Mr.

22    Foss would suffer significant harm and embarrassment if he could no longer participate in the

23    very bingo games that he dedicates so much volunteer effort to facilitate. Ms. Sebastiani would

24    lose her *only* social outlet. (Foss Decl., ¶ 11; Sebastiani Decl., ¶ 4.)

25           Denying disabled persons the ability to engage in this form of entertainment cannot be

26    remedied at law. Indeed, it is not only the possibility of winning money that prompts people,

27    both able-bodied and disabled, to play bingo. People, regardless of disability, also play bingo for

28    the satisfaction and social interaction they receive from simply playing the game. (*See id.*)

1    **2.    The Bureau Will Suffer No Hardship From Maintaining The Status Quo.**

2    By contrast to the dramatic injuries the Bureau's enforcement of its Orders would visit on

3    plaintiffs, the Bureau would suffer no harm from the continuation of the status quo.  Neither the

4    Bureau nor any other government agency has previously commenced any enforcement action

5    against VGT's electronic bingo aids.  (Wilson Decl., ¶ 4.)  As such, plaintiffs are merely asking

6    the Court to temporarily require the Bureau to do what it has been doing all along – nothing –

7    until the Court can determine whether the Bureau would be legally justified in shutting down

8    charitable bingo in Northern California.  Even if the Court ultimately decides that the Bureau may

9    proceed with its enforcement actions, the intervening delay would have no tangible impact on the

10   Bureau.  The balance of harms weighs heavily in favor of the issuance of a temporary restraining

11   order.

12   **3.    The Public Interest Favors Issuance of a Temporary Restraining Order.**

13   The public interest "is an important consideration in the exercise of equitable discretion in

14   the enforcement of statutes" (*U.S. v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th

15   Cir. 1987)), and a court "must always consider whether the public interest would be advanced or

16   impaired by issuance of an injunction in any action in which the public interest is affected"

17   (*Caribbean Marine Serv. Co., Inc. v. Baldridge*, 844 F.2d 668, 677 (9th Cir. 1988)).

18   In this case, it is plainly in the public interest to maintain the status quo and allow bingo

19   facilities to continue to provide revenue to charitable organizations, which, by their very nature,

20   are designed to serve the public interest.  It is also in the public interest to ensure that property

21   rights are protected from government seizure without due process.  And it is in the public interest

22   to ensure that disabled persons have access to the same services as non-disabled persons pending

23   resolution of the merits of plaintiffs' case.

24   Accordingly, every factor in the TRO calculus – the likelihood of prevailing on their

25   claims; the balance of hardships; and the public interest – weighs in plaintiffs' favor.  The Court

26   should therefore issue the requested TRO and set this matter for a fuller briefing on plaintiffs'

27   application for a preliminary injunction.

28

DLA PIPER US LLP

-20-

*EX PARTE* MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**IV.**
**CONCLUSION**

For all of the foregoing reasons, plaintiffs respectfully request that the Court issue a temporary restraining order and an order to show cause why a preliminary injunction should not issue to enjoin the Bureau, and all persons and/or agencies acting in concert or participation with it, from enforcing the Orders pending final resolution of the merits of plaintiffs' claims.

Dated: June 2, 2008

DLA PIPER US LLP

By _____
MATTHEW G. JACOBS
Attorney for Plaintiffs
VIDEO GAMING TECHNOLOGIES, INC.,
UNITED CEREBRAL PALSY OF GREATER
SACRAMENTO, WIND YOUTH SERVICES,
ROBERT FOSS, and JOAN SEBASTIANI

DLA PIPER US LLP
LOS ANGELES

WEST\21418048.3

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE*
MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION