1   MATTHEW G. JACOBS (Bar No. 122066)
    matthew.jacobs@dlapiper.com
2   ALEXANDER M. MEDINA (Bar No. 222015)
    alexander.medina@dlapiper.com
3   DLA PIPER US LLP
    400 Capitol Mall, Suite 2400
4   Sacramento, CA  95814-4428
    Tel:  916.930.3200
5   Fax:  916.930.3201

6   GEORGE GIGOUNAS (Bar No. 209334)
    george.gigounas@dlapiper.com
7   DEBORAH E. MCCRIMMON (Bar No. 229769)
    deborah.mccrimmon@dlapiper.com
8   DLA PIPER US LLP
    153 Townsend Street, Suite 800
9   San Francisco, CA 94107
    Tel:  415.836.2500
10  Fax:  415.836.2501

11  Attorneys for Plaintiffs
    VIDEO GAMING TECHNOLOGIES, INC.,
12  UNITED CEREBRAL PALSY OF GREATER
    SACRAMENTO, WIND YOUTH SERVICES,
13  ROBERT FOSS, and JOAN SEBASTIANI

14              UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16               SAN FRANCISCO DIVISION

17  VIDEO GAMING TECHNOLOGIES,          CASE NO.:  CV 08 2748
    INC., dba VGT, Inc., a Tennessee
18  Corporation; UNITED CEREBRAL        DECLARATION OF ALEXANDER M.
    PALSY OF GREATER SACRAMENTO,        MEDINA IN SUPPORT OF PLAINTIFFS'
19  a California Non-Profit Corporation;  MOTION FOR TEMPORARY
    WIND Youth Services, a California Non-  RESTRAINING ORDER AND FOR ORDER
20  Profit Corporation; ROBERT FOSS, an  TO SHOW CAUSE FOR PRELIMINARY
    individual; and JOAN SEBASTIANI, an  INJUNCTION
21  individual,

22              Plaintiffs,             Date:
                                        Time:
23      v.                              Dept.:
                                        Judge:
24  BUREAU OF GAMBLING CONTROL, a
    law enforcement division of the California
25  Department of Justice; MATHEW J.
    CAMPOY, in his official capacity as the
26  Acting Chief of the Bureau of Gambling
    Control,
27
                Defendants.
28

-1-

MEDINA DECL. ISO MOTION FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

1    I, Alexander M. Medina, declare as follows:

2        1.    I am an attorney duly licensed to practice law before all courts of the State of

3    California. I am an attorney with the law firm of DLA Piper US LLP, counsel of record for

4    plaintiffs in the above-captioned action. I have personal knowledge of the facts stated herein and

5    would be able to testify competently to these facts if called as a witness.

6        2.    True and correct copies of cease-and-desist orders served by the Bureau of

7    Gambling Control ("Bureau") on several bingo facilities in Alameda and Sacramento Counties

8    are attached hereto as Exhibit A.

9        3.    A true and correct copy of the Attorney General's August 10, 2007 Law

10    Enforcement Advisory is attached hereto as Exhibit B.

11        4.    A true and correct copy of the court's Statement of Decision in *St. Mary's Catholic*

12    *Church et al. v. City of National City*, San Diego Superior Court Case No. 563569 (Sept. 9, 1986)

13    is attached hereto as Exhibit C.

14        5.    A true and correct copy of the Attorney General's September 15, 1983 Opinion on

15    video poker is attached hereto as Exhibit D.

16        6.    A true and correct copy of a May 9, 2008 newspaper article by John Simerman

17    concerning the Bureau's cease-and-desist orders, and posted on ContraCostaTimes.com

18    (http://www.contracostatimes.com/ci_9210960?nclick_check=1 article, last visited May 31,

19    2008), is attached hereto as Exhibit E.

20        7.    At 8:46 a.m. on Monday, June 2, 2008, my assistant faxed a letter from my

21    colleague Matthew Jacobs (with a subsequent e-mail copy at 8:51 a.m.) to Mathew J. Campoy,

22    Acting Chief of the Bureau and author of the cease-and-desist orders, informing him that

23    plaintiffs would be filing a complaint in the United States District Court, Northern District of

24    California, San Francisco Division, seeking declaratory and injunctive relief in connection with

25    the cease-and-desist orders. This letter further informed Mr. Campoy that plaintiffs will also file

26    a Motion for Temporary Restraining Order and Order to Show Cause for Preliminary Injunction

27    as soon as their complaint is filed, and that plaintiffs would provide further notice of the date,

28    time, and location of the hearing on such motion upon obtaining that information from the Court.

-2-

1    Jacob Appelsmith, Special Assistant Attorney General, was copied on the e-mail to Mr. Campoy.

2    A true and correct copy of Mr. Jacobs' June 2, 2008 letter to Mr. Campoy is attached hereto as

3    Exhibit F.

4           I declare under penalty of perjury under the laws of the State of California that the

5    foregoing is true and correct and that this declaration was executed on June 2, 2008 at

6    _Sacramento_____, California.

7

8                                                    _____
                                                     ALEXANDER M. MEDINA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

01/10/2002  03:14    91624471                                    PAGE  02

**EDMUND G. BROWN JR**
Attorney General

*State of California*
**DEPARTMENT OF JUSTICE**



DIVISION OF LAW ENFORCEMENT
BUREAU OF GAMBLING CONTROL
P.O. Box 168024
Sacramento, CA 95816
Public: (916) 263-3408

*SACRAMENTO BINGO CENTER*
*3399 ARDEN WY.*
*SACRAMENTO, CA.*

Facsimile: (916) (916) 263-0839
(916) (916) 263-0362

May 7, 2008

RE:    <u>Unlawful Electronic Bingo Devices</u>

To Whom It May Concern:

   On [ *May 7th, 2008* ], agents of the Bureau of Gambling
          Date of inspection upon which letter is based
Control visited [ *Sacramento Bingo*, located at [ *3399 Arden Wy., Sac, CA*] in
          Name of bingo operation              address and city of bingo operation
[ *Sacramento* ] and inspected electronic bingo devices at the bingo facility. The Bureau has
name of county
determined the electronic bingo devices, which were present at the facility at the time of the
inspection, are unlawful in California pursuant to Penal Code Section 318, 321, 326.5 and 330b.

   On the date of the inspection, Supervisor/Manager/Owner/Legal Representative
[ *Vincent Marfia*] was verbally advised by Bureau agents that the electronic devices present on
name of employee]
the day of inspection were unlawful in California, and that he/she must cease operating such
unlawful electronic devices in the play of the game of bingo.

          Describe the make/model of gaming devices:
*VIDEO GAMING TECHNOLOGY - 66 GAMING DEVICES.*
*CAPITOL BINGO - 25 GAMING DEVICES.*
✗ *EXAMPLES of GAMING DEVICES: MULTI GAME - CRAZY BALL BINGO, CRAZY BILL'S*
*GOLD STRIKE, ESMERALD'S DREAM, RED BALL ROUND, MR. MILLIONAIRE, TREASURE*
   If, after thirty (30) days following the date of this letter, the electronic devices identified *QUEST*
above remain present on the premises identified above, the Bureau will pursue such further
enforcement action as may be necessary, including but not limited to, seizing the unlawful
gambling devices and associated unlawful proceeds and criminal prosecution of the offender.
(Bus. & Prof. Code § 19826, subd. (c), Pen. Code §§ 321, 325, 326.5 and 335a.)

✗ *CALIFORNIA ELECTRONIC BINGO AID*

May 7, 2008
Page 2

This letter constitutes notice, which, although not legally required, is provided to enable
[Sacramento Bingo  ] to bring its operations into compliance with California law.
Name of bingo operation

Your anticipated cooperation is expected and appreciated.

Sincerely,

MATHEW J. CAMPOY
Acting Bureau Chief

For    EDMUND G. BROWN JR.
       Attorney General

05-14-'08 11:59 FROM-                                    T-651  P001/002 F-198

EDMUND G. BROWN JR                          State of California
Attorney General                      DEPARTMENT OF JUSTICE



DIVISION OF LAW ENFORCEMENT
BUREAU OF GAMBLING CONTROL
P.O. Box 168024
Sacramento, CA 95816
Public: (916) 263-3408

Facsimile: (916) 263-0839
(916) 263-0362

May 7, 2008

RE:    Unlawful Electronic Bingo Devices

To Whom It May Concern:

On [ _5/8/2008_ ], agents of the Bureau of Gambling
        Date of inspection upon which letter is based
Control visited [ _North Watt Bingo Pala_ ] located at [ _5715 Watt Ave., North Highlands_ ] in
              Name of bingo operation           address and city of bingo operation
[ _Sacramento County_ ] and inspected electronic bingo devices at the bingo facility. The Bureau has
  name of county
determined the electronic bingo devices, which were present at the facility at the time of the
inspection, are unlawful in California pursuant to Penal Code Section 318, 321, 326.5 and 330b.

        On the date of the inspection, Supervisor/Manager/Owner/Legal Representative
[ _Rip Frown_ ] was verbally advised by Bureau agents that the electronic devices present on
name of employee
the day of inspection were unlawful in California, and that he/she must cease operating such
unlawful electronic devices in the play of the game of bingo.

_V6T  (72)_      Describe the make/model of gaming devices:
_Capital Gaming - (28)  "Crazy Ball"_

        If, after thirty (30) days following the date of this letter, the electronic devices identified
above remain present on the premises identified above, the Bureau will pursue such further
enforcement action as may be necessary, including but not limited to, seizing the unlawful
gambling devices and associated unlawful proceeds and criminal prosecution of the offender.
(Bus. & Prof. Code § 19826, subd. (c), Pen. Code §§ 321, 325, 326.5 and 335a.)

05-14-'08 11:59 FROM-                                    T-651  P002/002 F-198

May 7, 2008
Page 2


        This letter constitutes notice, which, although not legally required, is provided to enable
[ North Well Bingo Palace ] to bring its operations into compliance with California law.
Name of bingo operation

        Your anticipated cooperation is expected and appreciated.


                                    Sincerely,


                                    MATHEW J. CAMPOY
                                    Acting Bureau Chief


                            For     EDMUND G. BROWN JR.
                                    Attorney General



SA Christian Nagard

5/8/08

MAY-13-08 04:36 PM                                              P.01

**EDMUND G. BROWN JR**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**



DIVISION OF LAW ENFORCEMENT
BUREAU OF GAMBLING CONTROL
P.O. Box 168024
Sacramento, CA 95816
Public: (916) 263-3408

*BINGO*

*MAYHEW COMMUNITY SERVICE CENTER*
*9333 TECH CENTER DR. #200*
*SACRAMENTO, CA.*

Facsimile: (916) 263-0839
(916) 263-0362

May 7, 2008

RE:   **Unlawful Electronic Bingo Devices**

To Whom It May Concern:

On [ *MAY 8 2008* ], agents of the Bureau of Gambling
        Date of inspection upon which letter is based
Control visited [ *MAYHEW COMMUNITY BINGO CENTER* ], located at [ *9333 TECH CENTER DR. #200* ] in
        Name of bingo operation            address and city of bingo operation
[ *SACRAMENTO* ] and inspected electronic bingo devices at the bingo facility. The Bureau has
        name of county
determined the electronic bingo devices, which were present at the facility at the time of the
inspection, are unlawful in California pursuant to Penal Code Section 318, 321, 326.5 and 330b.

        On the date of the inspection, Supervisor/Manager/Owner/Legal Representative
[ *DICK ECKSTEIN* ] was verbally advised by Bureau agents that the electronic devices present on
        name of employee
the day of inspection were unlawful in California, and that he/she must cease operating such
unlawful electronic devices in the play of the game of bingo.

        Describe the make/model of gaming devices:

*46 VLT MACHINES, INCLUDING RED BALL, MR.*
*MILLIONAIRE, TREASURE, GOLD STRIKE, ESMERALDA'S*
*DREAM*

        If, after thirty (30) days following the date of this letter, the electronic devices identified
above remain present on the premises identified above, the Bureau will pursue such further
enforcement action as may be necessary, including but not limited to, seizing the unlawful
gambling devices and associated unlawful proceeds and criminal prosecution of the offender.
(Bus. & Prof. Code § 19826, subd. (c), Pen. Code §§ 321, 325, 326.5 and 335a.)

May 7, 2008
Page 2

This letter constitutes notice, which, although not legally required, is provided to enable
~~MATHEW COMPANITY~~ to bring its operations into compliance with California law.
Name of bingo operation

Your anticipated cooperation is expected and appreciated.

Sincerely,

MATHEW J. CAMPOY
Acting Bureau Chief

For     EDMUND G. BROWN JR.
Attorney General

SAS DONALD VANE DOORN
SAS RON NAKABAYASHI

**EDMUND G. BROWN JR**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**



*GILMAN STREET BINGO*

DIVISION OF LAW ENFORCEMENT
BUREAU OF GAMBLING CONTROL
P.O. Box 168024
Sacramento, CA 95816
Public: (916) 263-3408
Facsimile: (916) 263-0839
(916) 263-0362

*5-12-08*
Date of inspection

RE:  Unlawful Electronic Bingo Devices

To Whom It May Concern:

On [ *5-12-08* ], agents of the Bureau of Gambling Control (Bureau) visited
Date of inspection
[ *GILMAN STREET BINGO* ], located at [ *1284 SAN PABLO AVE BERKELEY* ] in
Name of bingo operation                                    address and city of bingo operation
[ *ALAMEDA COUNTY* ] and inspected electronic bingo devices at the bingo facility. The Bureau has determined
name of county
the electronic bingo devices, which were present at the facility at the time of the inspection, are unlawful in California pursuant to
Penal Code Section 318, 321, 326.5 and 330b.

On the date of the inspection, Supervisor/Manager/Owner/Legal Representative
[ *ULYSSES COOPERWOOD* ] was verbally advised by Bureau agents that the electronic devices present on the day of
name of employee
inspection were unlawful in California, and that he/she must cease operating such unlawful electronic devices in the play of the game
of bingo.

Describe the make/model of gaming devices:
*"VGT INC ( 3D VIDEO GAMING DEVICES ) iE. "REDBALL"*
*"MR. MILLIONAIR," "ESMERALDA", "TREASURE QUEST," "GOLD STRIKE"*

If, after thirty (30) days following the date of this letter, the electronic devices identified above remain present on the
premises identified above, the Bureau will pursue such further enforcement action as may be necessary, including but not limited to,
seizing the unlawful gambling devices and associated unlawful proceeds, and criminal prosecution of the offender. (Bus. & Prof. Code
§ 19826, subd. (c), Pen. Code §§ 321, 325, 326.5 and 335a.)

This letter constitutes notice, which, although not legally required, is provided to enable
[ *GILMAN STREET BINGO* ] to bring its operations into compliance with California law.
Name of bingo operation

Your anticipated cooperation is expected and appreciated.

*ULYSSES COOPERWOOD*

*SPECIAL AGENT*
*VANCE NABETA*

Sincerely,

MATHEW J. CAMPOY
Acting Bureau Chief

For    EDMUND G. BROWN JR.
Attorney General

*5-12-08*

**EDMUND G. BROWN JR**
**Attorney General**

*State of California*
**DEPARTMENT OF JUSTICE**



DIVISION OF LAW ENFORCEMENT
BUREAU OF GAMBLING CONTROL
P.O. Box 168024
Sacramento, CA 95816
Public: (916) 263-3408

Facsimile: (916) 263-0839
(916) 263-0362

May 7, 2008

RE:    <u>Unlawful Electronic Bingo Devices</u>

To Whom It May Concern:

On [ _MAY 8 2008_ ], agents of the Bureau of Gambling
    Date of inspection upon which letter is based
Control visited [_MADISON AVE CHARITIES_], located at [_8830 MADISON AVE, FAIR OAKS_] in
    Name of bingo operation                address and city of bingo operation
[_SACRAMENTO (A)_] and inspected electronic bingo devices at the bingo facility. The Bureau has
    name of county
determined the electronic bingo devices, which were present at the facility at the time of the
inspection, are unlawful in California pursuant to Penal Code Section 318, 321, 326.5 and 330b.

On the date of the inspection, Supervisor/Manager/Owner/Legal Representative
[_DEANN SOAREZ_] was verbally advised by Bureau agents that the electronic devices present on
    name of employee
the day of inspection were unlawful in California, and that he/she must cease operating such
unlawful electronic devices in the play of the game of bingo.

Describe the make/model of gaming devices:
_APEX, REDBALL, QUICK SHOT BINGO, CUMBERLANS DREAM,_
_MR. MILLIONAIRE, GOLD STRIKE, TREASURE QUEST, CRAZY BALL BINGO_
_TOTAL OF ~~FIF~~ MACHINES_
     _72_

If, after thirty (30) days following the date of this letter, the electronic devices identified
above remain present on the premises identified above, the Bureau will pursue such further
enforcement action as may be necessary, including but not limited to, seizing the unlawful
gambling devices and associated unlawful proceeds and criminal prosecution of the offender.
(Bus. & Prof. Code § 19826, subd. (c), Pen. Code §§ 321, 325, 326.5 and 335a.)

May 7, 2008
Page 2

This letter constitutes notice, which, although not legally required, is provided to enable
[Mohican Man consult?] to bring its operations into compliance with California law.
Name of bingo operation

Your anticipated cooperation is expected and appreciated.

Sincerely,

MATHEW J. CAMPOY
Acting Bureau Chief

For    EDMUND G. BROWN JR.
Attorney General

# EXHIBIT B



# DIVISION OF GAMBLING CONTROL

EDMUND G. BROWN JR.
**Attorney General**

ROBERT E. LYTLE
Director

NUMBER 9 · · · · · · · · · · LAW ENFORCEMENT ADVISORY · · · · · · · · · AUGUST 10, 2007

## "ELECTRONIC BINGO"

The Division of Gambling Control is providing this advisory to law enforcement agencies to address bingo games played with electronic devices, as offered by authorized organizations under Penal Code section 326.5. The Division considers electronic systems of bingo that substitute computers with stored bingo matrices, in lieu of paper or cardboard bingo cards, to be unauthorized by Penal Code section 326.5. Such bingo games constitute unlawful lotteries under California law (Pen. Code, § 319) and the conduct of such a game is a misdemeanor (Pen. Code, § 320). The Division, however, does not consider bingo games in which players purchase and receive paper or cardboard bingo cards to be rendered unlawful by the use of an electronic aid that notifies the player of a winning card, where the combined use of the electronic aid and the traditional cards allow the player to meet the requirements of Penal Code section 326.5, subdivision (o).

California law prohibits the conduct of lotteries (Cal. const., art. IV, § 19, subd. (a); Pen. Code, § 320) other than by the California State Lottery (Cal. Const., art. IV, § 19, subd. (d)). An exception to this general prohibition exists for bingo games that are conducted for charitable purposes under local ordinances authorized by the Legislature under article IV, section 19, subdivision (c) of the California Constitution.

Penal Code section 326.5 permits bingo games to be conducted "by organizations exempted from the payment of the bank and corporation tax by Sections 23701a, 23701b, 23701d, 23701e, 23701f, 23701g, and 23701*l* of the Revenue and Taxation Code and by mobilehome park associations and senior citizens organizations," if the proceeds are used only for charitable purposes and the games are conducted in a city, county, or city and county pursuant to an ordinance enacted under the constitutional provision. (Pen. Code, § 326.5, subd. (a).)

Section 326.5 specifies precisely what the game of bingo is that is permitted under these conditions. Subdivision (o) of Penal Code section 326.5 provides:

> (o) As used in this section, "bingo" means a game of chance in which prizes are awarded on the basis of designated numbers or symbols on a card that conform to numbers or symbols selected at random. Notwithstanding Section 330c, as used in this section, the game of bingo includes cards having numbers or symbols that are concealed and preprinted in a manner providing for distribution of prizes. The winning cards shall not be known prior to the game by any person

participating in the playing or operation of the bingo game. All preprinted cards shall bear the legend, "for sale or use only in a bingo game authorized under California law and pursuant to local ordinance." It is the intention of the Legislature that bingo as defined in this subdivision applies exclusively to this section and shall not be applied in the construction or enforcement of any other provision of law.

In 1987, the Attorney General addressed, in a formal opinion, the question whether an electronic system of bingo that substitutes a hand computer with stored bingo "card" matrices for the traditional paper or cardboard cards qualifies as bingo within the meaning of Penal Code section 326.5, subdivision (o). (70 Ops.Cal.Atty.Gen.304 (1987).) The Attorney General observed, "The only difference between the manner in which traditional bingo and the system of electronic bingo is played is that the handset with pre-programmed cards is used instead of the usual paper or cardboard bingo cards. Is this distinction a critical distinction for purposes of section 326.5? We believe that it is." (*Id.*, at p. 306.) The Attorney General explained:

> It goes without saying that the handsets at issue herein do not have thereon "numbers or symbols on a card" There is no card at all. It is only through the computer program that electronic representations of bingo cards may be called-up and displayed on the handset's screen. These representations are no more bingo cards than persons depicted on a television screen are the persons themselves.

> \*       \*       \*       \*       \*

> In our view, [the electronic bingo system] just does not fall within the meaning of section 326.5, subdivision (o), so as to qualify it for use in "charitable bingo." In our opinion, the question whether this type of electronic bingo, *or any type of electronic bingo*, should be used for "charitable bingo" is a matter to be addressed to the Legislature.

(*Id.*, at p. 308; italics in original.)

During the 20-year period which has followed the Attorney General's opinion quoted above, the Legislature has amended Penal Code section 326.5 twice, but it has not amended the section to authorize electronic bingo. It has, however, amended subdivision (o), containing the definition of bingo, but notably, it has made no change to the elements of the definition itself. Accordingly, subdivision (o) of section 326.5, as quoted above, continues to prescribe the elements of the game that is permissible as bingo, conducted by organizations authorized by section 326.5, subdivision (a).[1]

The Attorney General, however, has subsequently concluded that in games in which players purchase and receive traditional bingo cards, the use of an electronic aid to notify the player of a winning card is not prohibited. The Attorney General concluded that under these

---

[1] Approval by the National Indian Gaming Commission of electronic bingo games or devices as "class II" gaming is applicable to bingo conducted by federally-recognized Indian tribes only. (25 U.S.C. §§ 2703(7)(A)(i); 2706(b); 2710(b); 25 C.F.R. § 501.2,(a).) Such approval does not render such games or devices permissible to authorized organizations under Penal Code section 326.5. Any game of bingo offered by such an organization must comply with the definition of bingo in subdivision (o) of section 326.5.

circumstances, "the combined use of the electronic aid *and* traditional cards will allow each player to meet the requirements of subdivision (o), since the 'designated numbers or symbols' are 'on a card' as well as being programmed into the electronic aid." (81 Ops.Cal.Atty.Gen 415, at p. 417 (1998).)

Accordingly, electronic systems of bingo that substitute computers with stored bingo matrices, in lieu of paper or cardboard bingo cards, are unauthorized by Penal Code section 326.5 and are prohibited. (Pen. Code, §§ 319, 320.) Bingo games in which players purchase and receive paper or cardboard bingo cards are not rendered unlawful by the use of an electronic aid that notifies the player of a winning card, where the combined use of the electronic aid and the traditional cards allow the player to meet the requirements of Penal Code, subdivision (o).

Copies of the Attorney General's opinions referred to in this law enforcement advisory are attached for ease of reference.

---

*For more information regarding this advisory, contact the California Department of Justice, Division of Gambling Control, at (916) 263-3408.*

# EXHIBIT C



F I L E D
SEP 9 1986

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

ST. MARY'S CATHOLIC CHURCH, a nonprofit
religious organization, FATHER WILLIAM
J. GRIMAN, and SELECTRO-VISION, LTD.,
a California corporation

     Plaintiff,

vs.

THE CITY OF NATIONAL CITY, a municipal
corporation, and DOES 1 through 100,
inclusive,

     Defendants.

Case No. 563569

STATEMENT OF DECISION
(Cal. Rules of Ct., Rule 232)

    The above-entitled cause came on regularly for trial on August 6, 1986, in Department 23 of the above-entitled court, the Honorable William L. Todd, Jr., Judge, presiding without a jury, and was tried on that date and August 7, 1986 and August 11, 1986. Sanford M. Piech appeared as counsel for plaintiffs and George H. Eiser, III appeared as counsel for defendant.

    Oral and documentary evidence was introduced on behalf of the respective parties and the cause was argued and submitted for decision. The court, having considered the evidence and heard the arguments of counsel and being fully advised, issues the following statement of decision:

/

//

- 1 -

1.   With regard to the issue of whether plaintiff's Bingo Master electronic bingo device constitutes a "card" within the meaning of the Section 326.5(o) of the California Penal Code, and Section 6.42.020 of the National City Municipal Code, the court's decision is that the Bingo Master constitutes a card within the meaning of the appropriate statutes and ordinances and is not unlawful under those authorities.

a.   The court based its decision on the following facts:

The Selectro-Vision, Ltd. Bingo Master is an electronic device which permits the storing of up to forty bingo "cards" within one device. The number of "cards" to be stored within the Bingo Master depends on the number of "cards" purchased from the cashier at the time the device is delivered to the player. By pressing various keys the player can cause the pre-programmed bingo "cards" to be depicted consecutively on the device. The depicted grid square is identical to the type used in traditional bingo cards. The player can punch in the bingo numbers drawn by the caller and these numbers are automatically covered on each of the stored bingo "cards" within the Bingo Master which contain the called numbers. The player is audibly advised when he accomplishes the bingo pattern by a musical tune emanating automatically when bingo is attained. The device has a security system which permits a tie-in to the original purchase transaction through a receipt issued automatically at the time of purchase. This system thus makes it practically impossible to cheat by substituting a non-official machine for the Bingo Master actually purchased. At the end of an evening of playing, a complete profit and loss statement for the entire evening of bingo is automatically prepared within minutes of the close of play. The stored "cards" within the Bingo Master can be perpetuated through manual pressure on one or more of the device's control plates every 1-1/2 hours until the energy generated by its battery power source is completely exhausted. If the controls are not pressed within each

-2-

1  successive 1-1/2 hours period, the "cards" within the device are eliminated.

2      b.  The legal basis for the court's decision is:

3      Both Penal Code section 326.5 and National City Municipal Code

4  section 6.42.020(A) describe bingo as ". . . a game of chance in which prizes

5  are awarded on the basis of designated numbers or symbols on a card which

6  conform to numbers or symbols selected at random . . . ."

7      The Court finds that the use of this device results in the playing of

8  bingo as intended by the body of law authorizing this game in California.  The

9  manner of playing the game is somewhat altered.  While expert players can

10 manage 18 or more individual bingo cards at a time, almost any player can

11 manage 40 "cards" in the Bingo Master game.  The anticipation of nearing a

12 bingo win is diminished through the use of the Bingo Master unless a player

13 develops an amazing facility at operating the electronic device so as to view

14 successive "cards" on the viewing grid in a very short period of time.  Only

15 time and experience will determine whether this skill can be developed in a

16 manner similar to the skill previously mentioned in the management of

17 individual bingo cards.  While players will not be able to monitor the "cards"

18 of neighboring players, the device itself is designed to prevent cheating by

19 an individual player.  The problems of collusion or cheating by management

20 which exist under the present traditional bingo procedure will not be

21 eliminated by the use of the Bingo Master.  However, accounting for financial

22 transactions at an evening's bingo game will be dramatically improved and law

23 enforcement will be able to develop procedures to effectively monitor the

24 Bingo Master process.

25 //

26 //

27 //

28 //

- 3 -

Any perceived absence of anticipation, excitement, or competition, caused by use of the Bingo Master is outweighed by the potential for greater sociability during the playing of the game and by the ability of elderly players to compete more evenly with younger players. In any event, the factors mentioned in this paragraph are not essential elements of the game of bingo.

Any contentions concerning the economic effect of this system of playing bingo is speculative. There is no significant evidence of an economic impact material on the issue of the lawfulness of the Bingo Master.

Dated: Sept 9, 1986

APPROVED AS TO FORM AND CONTENT:

George H. Elser, III
Attorney for Defendant

Sanford M. Fisch
Attorney for Plaintiffs

Judge of the Superior Court

WILLIAM L. TODD, JR.

- 4 -

# EXHIBIT D

**LexisNexis**⁷ *Total Research System*                    Switch Client | Preferences | Sign Off | [?] Help

‖ Search ‖ Research Tasks ‖ Get a Document ‖ Shepard's® ‖ Alerts ‖ Total Litigator ‖ Transactional Advisor ‖ Cour

Service: Get by LEXSEE®
Citation: 66 Ops. Cal. Atty. Gen. 276

*1983 Cal. AG LEXIS 38, \*; 66 Ops. Cal. Atty. Gen. 276*

OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF CALIFORNIA

No. 83-610

1983 Cal. AG LEXIS 38; 66 Ops. Cal. Atty. Gen. 276

September 15, 1983

**CORE TERMS:** machine, player, card, skill, thing of value, blackjack, slot machine, screen, draw poker, poker, twenty-one, winning, button, played, coin, video, electronic, craps, predominantly, hazard, illegal gambling, furnish, replay, hi-lo, dealer, user, dice, playing time, video game, coin-operated

**REQUESTBY:**
[*1]

JOHN K. VAN DE KAMP, Attorney General (JOHN T. MURPHY, Deputy Attorney General)

**OPINION:**
THE HONORABLE WILLIAM C. CURTIS, DISTRICT ATTORNEY, MONTEREY COUNTY, has requested an opinion on the following question:

Is a coin-operated video game which simulates the games of blackjack, draw poker, hi-lo and craps, but which does not itself furnish the winning player with a free replay, extra playing time or any other direct pay-out, an illegal gambling device within the meaning of Penal Code sections 330b and 330.1?

CONCLUSION

A coin-operated video game which simulates the games of blackjack, draw poker, hi-lo and craps, but which does not itself furnish the winning player with a free replay, extra playing time or any other direct pay-out, is not an illegal gambling device per se within the meaning of Penal Code sections 330b and 330.1. However, if the device were used for gambling purposes, such as to furnish a thing of value to the winner or high scorer, it would become an illegal gambling device.

ANALYSIS

We are asked for our opinion on the legality under the state gaming laws of a coin-operated video device which reproduces several popular gambling games. As described to us, the device [*2] is essentially a video screen and a computer combined in a single cabinet. By placing a coin in a slot, the machine is activated and the player may select one of four games: blackjack, draw poker, hi-lo or craps. Each game is played by pressing the appropriate buttons with the video screen displaying representations of cards or dice in a manner consistent with the rules of the game and the choices of the player. Points are bet by the player during the course of each game and at the end of play a total point score is recorded on the screen. If the player is among the top ten scorers, he or she may be listed on the screen ranked according to the score achieved. The machine itself does not provide

Case 4:08-cv-02748-SBA     Document 8     Filed 06/02/2008     Page 25 of 39
Page 2 of 8
Get a Document - by Citation - 6. ups. Cal. Atty. Gen. 276

for free games, extra playing time for winning or any direct pay-outs, such as the release of coins, tokens or coupons. We have not been furnished with the rules of the video games involved but assume that these games simulate their counterparts as played with actual cards or dice. n1

n1 Generally, blackjack (or twenty-one) is a card game with the object to hit or nearly hit a total of twenty-one with two or more cards, without going over twenty-one or going under the dealer's twenty-one or less hand. In draw poker the player is dealt five cards and may discard and replace unhelpful cards. A winning hand is determined by suit, sequence or kind. Hi-lo is a form of poker in which a player may win with a bet on either a high or a low hand. Craps is a dice game in which the player may win by a first roll of seven or eleven, or by rolling points (4-5-6-8-9-10) before throwing a seven. (M.C. Fisk, The Gambler's Bible, Galahad Books, New York City, 1976.) [*3]

There are three California statutes relevant to our analysis. Penal Code n2 section 330b provides:

"(1) Unlawful acts; regulation of machines on vessels in interstate or foreign commerce. It is unlawful for any person to manufacture, repair, own, store, possess, sell, rent, lease, let on shares, lend or give away, transport, or expose for sale or lease, or to offer to repair, sell, rent, lease, let on shares, lend or give away, or to permit the operation of, or for any person to permit to be placed, maintained or kept in any place, room, space or building owned, leased or occupied by him or under his management or control, any slot machine or device as hereinafter defined, or to make or to permit to be made with any person any agreement with reference to any slot machine or device, as hereinafter defined, pursuant to which the user thereof, as a result of any element of hazard or chance or other outcome unpredictable by him, may become entitled to receive any money, credit, allowance, or thing of value or [*4] additional chance or right to use such slot machine or device, or to receive any check, slug, token or memorandum entitling the holder to receive any money, credit, allowance of thing of value; provided, however, that this section, insofar as it relates to owning, storing, possessing, or transporting any slot machine or device as hereinafter defined, shall not apply to any slot machine or device as hereinafter defined, located upon or being transported by any vessel regularly operated and engaged in interstate or foreign commerce, so long as such slot machine or device is located in a locked compartment of the vessel, is not accessible for use and is not used or operated within the territorial jurisdiction of this State.

"(2) Definition of slot machine. Any machine, apparatus or device is a slot machine within the provisions of this section if it is one that is adapted, or may readily be converted into one that is adapted, for use in such a way that, as a result of the insertion of any piece of money or [*5] coin or other object, or by any other means, such machine or device is caused to operate or may be operated, and by reason of any element of hazard or chance or of any other outcome of such operation unpredictable by him, the user may receive or become entitled to receive any piece of money, credit, allowance or thing of value or additional chance or right to use such slot machine or device, or any check, slug, token or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance or thing of value, or which may be given in trade, irrespective of whether it may, apart from any element of hazard or chance or unpredictable outcome of such operation, also sell, deliver or present some [*6] merchandise, indication of weight, entertainment or other thing of value.

"(3) Misdemeanor. Every person who violates this section is guilty of a misdemeanor.

"(4) Games of skill. It is expressly provided that with respect to the provisions of Section

Case 4:08-cv-02748-SBA    Document 8    Filed 06/02/2008    Page 26 of 39

Get a Document - by Citation - 6. Ops. Cal. Atty. Gen. 276    Page 3 of 8

330b only of this code, pin ball, and other amusement machines or devices which are predominantly games of skill, whether affording the opportunity of additional chances or free plays or not, are not intended to be and are not included within the term slot machine or device as defined in said Section 330b of this code." (Emphasis added.)

Section 330.1 states:

"Every person who manufactures, owns, stores, keeps, possesses, sells, rents, leases, lets on shares, lends or gives away, transports or exposes for sale or lease or offers to sell, rent, lease, let on shares, lend or give away or who permits the operation of or permits to be placed, maintained, used or kept in any room, space or building owned, leased or occupied by him or under his management or control, any slot machine [*7] or device as hereinafter defined, and every person who makes or permits to be made with any person any agreement with reference to any slot machine or device as hereinafter defined, pursuant to which agreement the user thereof, as a result of any element of hazard or chance, may become entitled to receive any thing of value or additional chance or right to use such slot machine or device, or to receive any check, slug, token or memorandum, whether of value or otherwise, entitling the holder to receive any thing of value, is guilty of a misdemeanor and shall be punishable by a fine of not more than five hundred dollars ($500) or by imprisonment in the county jail not exceeding six months or by both such fine and imprisonment. A slot machine or device within the meaning of Sections 330.1 to 330.5, inclusive, of this code is one that is, or may be, used or operated in such a way that, as a result [*8] of the insertion of any piece of money or coin or other object such machine or device is caused to operate or may be operated or played mechanically, electrically, automatically or manually, and by reason of any element of hazard or chance, the user may receive or become entitled to receive any thing of value or any check, slug, token or memorandum, whether of value or otherwise, which may be given in trade, or the user may secure additional chances or rights to use such machine or device, irrespective of whether it may, apart from any element of hazard or chance also sell, deliver or present some merchandise, indication of weight, entertainment or other thing of value." (Emphasis added.)

Finally, section 330.5 provides:  [*9]

"It is further expressly provided that Sections 330.1 to 330.4, inclusive, of this code shall not apply to music machines, weighing machines and machines which vend cigarettes, candy, ice cream, food, confections or other merchandise, in which there is deposited an exact consideration and from which in every case the customer obtains that which he purchases; and it is further expressly provided that with respect to the provisions of Sections 330.1 to 330.4, inclusive, only, of this code, pin ball, and other amusement machines or devices which are predominantly games of skill, whether affording the opportunity of additional chances or free plays or not, are not intended to be and are not included within the term slot machine or device as defined within Sections 330.1 to 330.4, inclusive, of this code." (Emphasis added.)


n2 Unless otherwise indicated, all further statutory references will be to the Penal Code.

In 65 Ops.Cal.Atty.Gen. 123 (1982), we concluded that an  [*10]  electronic computer device which was programmed to play on a video screen, upon the insertion of a coin, blackjack or twenty-one, and to reward the successful user with additional playing time, was a gaming device proscribed in Penal Code sections 330b and 330.1 since it involved predominantly chance rather than skill. Based on the description given us in the instant request, the four-game machine is similar in design to that discussed in our 1982 opinion with the exception that the four-game machine does not furnish the winner with free replays, additional playing time n3 or any intrinsic pay-out.

Case 4:08-cv-02748-SBA    Document 8    Filed 06/02/2008    Page 27 of 39

Get a Document - by Citation - ( )ps. Cal. Atty. Gen. 276                                    Page 4 of 8

n3 We are informed that some machines are manufactured which may be converted to furnish free plays by the movement of a switch or other simple adjustment. This feature is not included in the description provided to us.

Under both section 330b and 330.1, there are three basic elements to the definition of unlawful gambling device: (1) operation by money, coin, object or other means; (2) the element of chance; and (3) something of value offered. The machine described to us is coin-operated so the first element is met. We start, then, with the element of chance.

At the outset we **[*11]** must contrast chance with skill. Games of skill do not fall within the gaming law prohibitions even if they afford the opportunity for free play. ( §§ 330b, subd. (4) and 330.5.) Whether a particular game is one of skill or chance is largely a factual issue. (Knowles v. O'Connor (1968) 266 Cal.App.2d 31, 33; William v. Justice Court (1964) 230 Cal.App.2d 87, 97.) To be exempted from the gaming laws, a machine must be "predominantly" a game of skill. ( §§ 330b, subd. (4) and 330.5.) In 37 Ops.Cal.Atty.Gen. 126, 128 (1961), we explained this distinction:

"The statute expressly provides, as one of the conditions of the exception, that the devices be 'predominantly games of skill.' It is not enough that the machines be partly a game of skill; the machines must be predominantly games of skill. 'Predominantly' according to Black's Law Dictionary (4th ed. 1951), means 'something greater or superior in power and influence to others with which it is connected or compared.' In everyday speech, it means the superior or controlling element. As applied to the machines enumerated in the exception provision, the predominant element is the one of greater force and effect in **[*12]** producing the end result than any other element."

The predominance of skill was described in WNEK Vending, Etc., v. City of Buffalo (1980) 107 Misc.2d 353, 434 N.Y.S.2d 608, 612-613, where the video game "Space Invaders" was discussed:

"I find that the video games which Petitioners seek to distribute are games of skill and therefore are not gambling devices. They depend upon eye-hand coordination, reflexes, muscular control and above all, concentration. Proper timing in aiming and firing is essential. The eyes and hands of an operator of a video game are in constant motion. The player must continually adapt to instantaneous changes in the position of his laser bases relative to the location of the invader projectiles. The amount of physical skill and energy required to successfully play a video game is enormous."

Similarly, the court in Knowles v. O'Conner, supra, 266 Cal.App.2d 31, 33, in describing a mechanical baseball game, stated:

"The [trial] court found the machines to be games of skill where the score to be achieved varies only with the skill and dexterity of the player. The skill is in pressing the button to swing the bat at the right time **[*13]** to strike the ball. In other words the skill depends on the reflexes and timing of the player."

Indeed, the addition of "flippers" to a pinball machine may change the device from a game of chance to a game of skill. (Cossack v. City of Los Angeles (1974) 11 Cal.3d 726, 732.) We turn now to chance.

There can be no serious doubt that blackjack, draw poker, hi-lo and craps are games of chance. (Jacques v. State Board of Equalization (1957) 155 Cl.App.2d 448, 459 (blackjack (twenty-one)); Tokar v. Redman (1956) 138 Cal.App.2d 350, 354 (draw poker); Nevcal Enterprises, Inc. v. Cal-Neva Lodge, Inc. (1961) 194 Cal.App.2d 177, 180 (low ball poker);

Case 4:08-cv-02748-SBA     Document 8     Filed 06/02/2008     Page 28 of 39

Get a Document - by Citation - 60 ɔps. Cal. Atty. Gen. 276                    Page 5 of 8

People v. Clay (1964) 227 Cal.App.2d 87, 97 (craps).) Does this chracteristic of unpredictability change because a game is played electronically? We do not believe so.

Mills-Jennings of Ohio v. Dept. of Liquor Control (1982) 70 Ohio St.2d 95, 435 N.E.2d 407, 408, concerned a draw poker machine which operated in this fashion:

"The Draw Poker machine in question is an electronic video-game controlled entirely by a computer called a microprocessor. The computer takes the place of a person [*14] who would otherwise serve as the dealer in a game of draw poker. In order to activate the machine for play, a player inserts from one to eight quarters into the machine. The player then pushes a button denoted as 'draw' and by random selection, five cards appear on the screen. The player has the option of keeping all five cards or any one or any one or more of them. When the player has decided which cards to keep, he then presses the 'discard' button, eliminating from the screen the cards the player does not wish to keep. The cards discarded are then replaced with new and different cards and this ends the game. If the player chooses not to discard any cards and wishes to 'stand' on the original five cards dealt by the machine, the plyer simply pushes the 'stand' button and this also ends the game."

The Supreme Court of Ohio concluded that since poker was a game of chance under an Ohio statute, the game as played on a machine was also a game of chance. "Whether the game being played is on a video screen or on a card table makes no real difference." (435 N.E.2d at p. 408.) Using the same reasoning in Treasure State Games, Inc. v. State (1976) 170 Mont. 189, 551 P.2d [*15] 1008, the Supreme Court of Montana found that an electronic Keno game was legal because nonelectronic Keno, when not played for cash prizes, was legal under Montana law. (See also Gallatin County v. D & R Music & Vending (1982 Mont.) 654 P.2d 998, 1000.)

Com. v. One Electronic Poker Game Machine (1982 Pa.Super.) 448 A.2d 1077, 1078, involved the seizure from a social club of electronic poker and blackjack games, which were described by the Superior Court of Pennsylvania as follows:

"The machines involved in this appeal simulate the games of poker and blackjack. To play a game the player must either insert from one to eight quarters or have accumulated sufficient 'skill points' from previous games. Consideration is required to play the games either in the form of coins or skill points. There are no rewards to the player who wins other than the award of skill points which can be used towards playing future games."

The court concluded tht the confiscation was illegal, since under Pennsylvania precedents a machine is a gaming device per se only if it can be used for no purpose other than gambling and the mere fact that a machine "involves a substantial element [*16] of chance" is insufficient to authorize seizure. (448 A.2d at p. 1078.) (See also, Com. v. One Electro-Sport Draw Poker Mach. (1981) 297 Pa.Super.54, 443 A.2d 295, 297.) The Commonwealth of Pennsylvania n4 reached a seemingly contrary result in Com. v. 9 Mills Mechanical Slot Machines (1981) 62 Pa.Cmwlth. 397, 437 A.2d 67. That case involved several machines including one identified as "Electronic Draw poker," described as follows (437 A.2d at p. 71):

"A single game on the Draw Poker machine may be had for a quarter. However, a player can put up to eight quarters in the machine at once, and thereby increase his or her pay-off, although the odds of winning remain the same. After inserting the coin, or coins, the player pushes a button which causes five facsimiles of playing cards to appear on the screen. The player then may choose to discard up to five cards and received an equal number of new cards in an effort to make the best possible poker hand. Different poker hands are rewarded with varying amounts of skill points; for example, a pair of aces awards one skill point; a flush awards eight skill points and a straight flush awards fifty skill points. [*17] A game lasts approximately ten seconds. Free games are awarded when a player obtains the requisite number of skill points. Again, the club made actual cash pay-offs to players who

Case 4:08-cv-02748-SBA    Document 8    Filed 06/02/2008    Page 29 of 39

Get a Document - by Citation - 6′ ⌐ps. Cal. Atty. Gen. 276                    Page 6 of 8

obtained a certain number of skill points."

In finding the device illegal, the court observed (437 A.2d at p. 71):

"We also believe the element of chance to be present, for, although some knowledge of the odds of obtaining various combinations of cards would enable a player to maximize his or her potential for winning, the outcome of the game is dependent entirely upon the electronic fall of the cards."

n4 Generally, the Commonwealth Court has original jurisdiction of all civil actions or proceedings against the state and its officers. By contrast, the Superior Court has appellate jurisdiction over the final orders of the Common Plea Courts (district trial courts), but no jurisdiction over the Commonwealth Court whose orders are reviewable in the Supreme Court. (Purdon's Pa. Consol. Stats. Anno., §§ 723(a), 741-742 and 761.)

Games Management, Inc. v. Owens (1983 Kan.) 662 P.2d 260, involved the electronic games "Double-Up" and "Twenty-One," the former being similar to draw poker. The **[*18]** games were described by the Supreme Court of Kansas as follows (at pp. 261-262):

"In the game of 'Double-Up', a quarter is placed in the coin slot to activate the machine. The player then pushes a button on the front of the machine which is labeled 'deal' whereupon five plying cards appear on a color television type screen. The game is programmed with a minimum standard for a winning hand such as 'Jacks or better.' The player then must make a decision whether to discard or retain the hand dealt. If he discards any cards, the player must again push the deal button and replacement cards appear on the screen. The object of the game is to attain the best poker hand. The reward for a winning hand is a free replay. The better the hand, the more replays won. The length of a game on the 'Double-Up' machine is approximately fourteen seconds. The game of 'Twenty-One' is a variation of the poker game known as blackjack. In it the player places a quarter in the coin slot to activate the machine. He then pushes the 'deal' button and four cards appear on a color television type screen. There are two cards dealt to the 'dealer' and two cards to the player. The dealer's cards are dealt **[*19]** one card face up and one card face down. The two cards dealt to the player are both face up. Just as in blackjack the player has the option, after seeing his cards, to receive another card or 'stand pat.' The card sequence is predetermined by the program placed in the machine. The player exercises the option by depressing one of two buttons, either 'hit' or 'stand.' After exercising the option the machine automatically deals cards to the dealer. The side attaining the score of twenty-one or closest without exceeding it wins. The reward for winning is two free replays for each quarter placed in the machine. the 'Twenty-One' machine takes anywhere from eight to ten seconds to play a game. As in all card games the players of either game have no choice as to what cards are dealt. The evidence did not disclose how many cards are programmed in each machine. Obviously, the programmer can place whatever cards in the machine he desires."

The trial court had ruled that the devices were games of chance but the awarding of free games did not constitute something of value, thus removing them from the definition of gambling device under Kansas Law. (662 P.2d at p. 262.) The Supreme **[*20]** Court affirmed and, noting that the cards appeared randomly and that the player had no control over them, expressly concurred in the finding that games of chance were involved. The court stated (662 P.2d at p. 264):

"Here the card sequences are electronically programmed in each machine. The small amount of skill required to play the games is clearly overshadowed by pure chance."

Our analysis was similar in 65 Ops.Cal.Atty.Gen. 123, supra. At page 127 we stated:

"The machine, of course, attempts to duplicate the card game of 'twenty-one' or 'blackjack' which is a popular casino gambling game. Indeed, the attraction of this game is the risk the player takes in making a bet without certainty as to the next card he or the dealer will draw. The card game of 'twenty-one' or 'blackjack,' when played for a thing of value, is expressly prohibited in California. ( § 330; United States v. Graham (9th Cir. 1976) 534 F.2d 1357, 1358.) From the description provided of the machine under discussion, the game is no more predictable or is no less a matter of hazard or chance because it is played on a computer."

In our view, the operation of the four-game machine described to us [*21] involves an "element of hazard or chance or of other outcome of such operation unpredictable by [the player]...." ( §§ 330b and 330.1.) "It is the character of the game rather than a particular player's skill or lack of it that determines whether the game is one of skill or chance." (Finster v. Keller (1971) 18 Cal.App. 3d 836, 844.) Skill is not the dominating factor in determining the results of the games.

The rolling of dice on a craps table does not suggest any measurable skill; the practice of kissing the dice or blowing on them merely beckons luck. A simulated roll of the dice on a television screen is no more artful. When poker is played with cards and with competitors, it would be helpful to the player if he or she possessed a skill such as an ability to count cards or a knowledge of psychology. However, the number of cards in a poker computer program is unknown; a bluff or a poker face is not likely to change the outcome of a game when the opponent is a computer. (Compare In re Allen (1962) 59 Cal.2d 5, 7 ("Bridge" is predominantly a game of skill).) Our opinion on electronic blackjack (65 Ops.Cal.Atty.Gen. 123, 128-129, supra) is equally applicable [*22] to electronic draw poker and hi-lo:

"The player is confronted with a computer program the nature of which is unknown to him. With the pressing of a button, the user does not know what the intricate electric circuitry will produce on the video screen. He cannot inspect the deck, ask for a new deck, have the cards reshuffled or evaluate the dealer. He may believe that his selection of a particular option generated the successful hand but only the machine and its predetermined program knows the real cause and effect."

We believe that skill is more illusory than real in the electronic card and dice games described to us.

However, we find the third element in the determination of the illegality of the device to be missing. Under the facts given to us, the machine itself does not offer any thing of value n5 to the player. We conclude then that the device is not per se an illegal gambling device.

n5 A thing of value is defined as "any money, coin, currency, check, chip, allowance, token, credit, merchandise, property, or any representative of value." ( § 330.2.) In our view, the intangible reward of being listed among the high scorers would not be a thing of value.

In [*23] Ferguson v. State (1981 Tenn.Cr.App.), 628 S.W.2d 37, the court reviewed the seizure of a coin-operated video blackjack machine. A person playing the game in the establishment where it was placed was given money by a cashier for games won. (628 S.W.2d at p. 38.) The owner of the machine defended it on several grounds, including (628 S.W.2d at p. 38):

"The owner (appellee) of the machine testified at the hearing that a certain amount of skill is involved in operating the machine. i.e., knowledge of cards but also admitted an element of chance was involved as to what card was coming up."

The court, however, concluded that with "... appellee himself acknowledging that there was an element of chance involved in the operation of the machine, coupled with the informant being paid five dollars by the cashier for winning the twenty games, the machine under these circumstances is a gambling device." (628 S.W.2d at p. 39.)

The facts given to us for analysis state that the player may accumulate point scores and that top scorers may have their records posted on the screen. However, if the scores of the players were used as a basis for furnishing money, merchandise or other thing [*24] of value, the machines would become illegal gambling devices. ( §§ 330a, 330b and 330.1; Hall v. Franchise Tax Board (1966) 244 Cal.App.2d 843, 847-848.)

We conclude that a coin-operated video game which simulates the games of blackjack, draw poker, hi-lo and craps, but which does not itself furnish the winning player with a free replay, extra playing time or any other direct pay-out, is not an illegal gambling device per se within the meaning of Penal Code sections 330b and 330.1. However, if the device were used for gambling purposes, such as to furnish a thing of value to the winner or high scorer, it would become an illegal gambling device.

* * *

## Legal Topics:

For related research and practice materials, see the following legal topics:



Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Gambling > Elements
Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Gambling > Penalties
Governments > State & Territorial Governments > Gaming & Lotteries

Service: Get by LEXSEE®
Citation: 66 Ops. Cal. Atty. Gen. 276
View: Full
Date/Time: Sunday, June 1, 2008 - 4:48 PM EDT

Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Transactional Advisor |
Counsel Selector
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

About LexisNexis | Terms & Conditions | Contact Us
**LexisNexis®** Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT E

# CONTRA COSTA TIMES
## ContraCostaTimes.com

## Bingo machines crackdown worries charities

By John Simerman
Contra Costa Times

Article Launched: 05/09/2008 06:12:09 PM PDT
East Bay charities that operate electronic gaming machines to lift their bingo parlor profits fear a sudden state crackdown this week on some games in Sacramento could spread — and slash a major source of nonprofit revenue.

The state Department of Justice for years had done little to enforce laws over what it considers illegal bingo machines that in some cases mimic slots — which only Indian tribes can legally operate on tribal land in California. State Attorney General Jerry Brown issued an opinion on electronic bingo in August, but some charity officials called it vague. With no enforcement, few stopped using the machines.

But the lack of enforcement ended Wednesday, when state agents launched a sweep of bingo halls known to operate the suspect machines. By Friday, agents had handed 30-day cease-and-desist orders to seven Sacramento-area bingo parlors and one in Southern California, Department of Justice officials said.

The department could seize machines if the charities fail to comply, the letter warned.

Many of the more than 300 bingo charities in California rely on the machines to salvage losses from a double hit: a decade-old smoking ban, and the explosion of Indian gaming into a $7 billion industry since California voters passed Proposition 1A in 2000.

Without its machines, "our charity will be significantly hurt and might not survive," said David Gibbs, executive director of the world class Concord Blue Devils drum and bugle corps, which supports 600 youths as well as a variety of school and community music programs. The charity gets some $250,000 annually — about 80 percent of its fundraising — from paper bingo and machines, Gibbs said.

"What it means is our programs get cut back, our teachers get cut back, the community is impacted," he said. "Short term, we could probably make do. Long term we wouldn't be able to compete."

Other charities in Oakland, Pleasant Hill, Albany and Antioch operate the machines, although it is unclear if the state will try to stop them.

Casino-owning Indian tribes, meanwhile, have long complained about the machines. Some tribes claim the lack of enforcement violates the terms of their gaming compacts and the monopoly they hold on slot machines and other electronic gaming devices in California. At least one tribe has threatened to suspend tens of millions of dollars in annual payments to the state.

Complaints have grown, and so has use of the machines, said Matt Campoy, acting chief of the state Bureau of Gambling Control, an arm of the state Department of Justice.

"More and more people were starting to believe that maybe it's OK (to operate the machines)," Campoy said. "We decided to take action to slow it down. Obviously, we're sympathetic toward the charities. But you can't conduct illegal business. It's illegal money."

Campoy said the enforcement would continue.

Advertisement

# ContraCostaTimes
.com

# (800) 598-4637

# Subscribe today!
### www.contracostatimes.com/subscriberservices



Print Powered By [FormatDynamics]

# CONTRA COSTA TIMES
### ContraCostaTimes.com

"A lot of the people we've been visiting, they knew we were coming," Campoy said. "They're kind of like, 'We knew this was going to happen, we just didn't know when.' "

A spokesman for a group of six powerful gaming tribes praised the state action. The group includes the Lytton Band of Pomo Indians, which operates more than 1,000 electronic bingo machines at the former Casino San Pablo site, which is now tribal land.

"The attorney general would not be out there delivering cease-and-desist orders if the state didn't feel they were violating the state constitution," said Doug Elmets, a spokesman for the California Tribal Business Alliance. "We realize the charities need assistance, but sneaking slot machines into bingo halls is not the solution."

Campoy, echoing an opinion from the Schwarzenegger administration, claimed that the machines used by bingo parlors are not slots, but that some are still illegal. According to Brown, bingo halls can use electronic "readers" to determine if a card is a winner, but not machines that substitute for bingo cards.

At the Veterans of Foreign Wars hall in Antioch on a recent night, dozens of bingo players sat at long white plastic tables, dabbing paper bingo sheets and also playing on black, computerized "Turbo Bingo" tablets. When the bingo caller dropped a ball, players dabbed their sheets and also entered the number into the electronic bingo "minders," which tracked hundreds of bingo matrices and sounded off when a player won. Other East Bay bingo halls use similar machines.

Those machines may be illegal, Campoy said, but the agency for now is targeting only more sophisticated machines that look and play like slot machines.

"In most cases, if they're not using paper, it's a strong possibility that they're illegal," he said. "Once the device is the major component of the game, you've changed the game."

Legalizing the machines for charity bingo halls would require a constitutional amendment, he said.

Gibbs, of the Concord Blue Devils, said it wasn't clear which of the charity's machines Brown might deem illegal. The charity has been running electronic bingo for about four years, Gibbs said.

Gibbs is treasurer of the California Charity Alliance, a newly formed group of about 40 bingo charities, that was pushing Friday for a meeting with Brown.

"We don't quite know what's happening," Gibbs said. "They're selecting certain machines the attorney general deems as not being legal. We just want a twig."

**Reach John Simerman at 925-943-8072 or jsimerman@bayareanewsgroup.com .**

Advertisement



ContraCostaTimes.com          (800) 598-4637

Subscribe today!
www.contracostatimes.com/subscriberservices

Print Powered By [FormatDynamics]

# EXHIBIT F



**DLA PIPER**

DLA Piper US LLP
400 Capitol Mall, Suite 2400
Sacramento, California 95814-4428
www.dlapiper.com

Matthew G. Jacobs
matthew.jacobs@dlapiper.com
T  916.930.3200
F  916.930.3201

June 2, 2008
*VIA FACSIMILE AND E-MAIL* (916.263.0839)

Mathew J. Campoy
Acting Bureau Chief
Bureau of Gambling Control
Department of Justice
1425 River Park Drive, Suite 400
Sacramento, CA  95815

Dear Mr. Campoy:

This firm represents Video Gaming Technologies, Inc., United Cerebral Palsy of Greater Sacramento, WIND Youth Services, Robert Foss, and Joan Sebastiani (collectively, "plaintiffs").

This letter is to inform you that today, June 2, 2008, plaintiffs will file a complaint in the United States District Court, Northern District of California, San Francisco Division, seeking declaratory and injunctive relief in connection with the Bureau of Gambling Control's ("Bureau's") recent cease-and-desist orders served on various charitable bingo facilities in Alameda and Sacramento Counties.

Upon filing the complaint and receiving a judicial assignment, plaintiffs will immediately file a Motion for Temporary Restraining Order and Order to Show Cause for Preliminary Injunction, which will seek to enjoin the Bureau from enforcing the cease-and-desist orders until a trial on the merits.

We cannot know the date, time, and location of the hearing on plaintiffs' motion until after the complaint is filed.  As such, we will promptly provide notice of the date, time, and location of the hearing (as well as service copies of all relevant documents) after obtaining that information from the Court.

If you have any questions, please call.  Thank you.



Matthew J. Campoy
June 2, 2008
Page Two

Very truly yours,

**DLA Piper US LLP**

Matthew G. Jacobs

MGJ:mis

cc:    Jacob Appelsmith, Esq. (via e-mail)

WEST\21419090.1

```
***********************
***   TX REPORT   ***
***********************

TRANSMISSION OK

TX/RX NO              2081
CONNECTION TEL                    92630839
SUBADDRESS
CONNECTION ID
ST. TIME              06/02 08:46
USAGE T               00'23
PGS. SENT             3
RESULT                OK
```



DLA Piper US LLP
400 Capitol Mall, Suite 2400
Sacramento, California 95814-4428
www.dlapiper.com

Matthew G. Jacobs
matthew.jacobs@dlapiper.com
T  916.930.3267
F  916.403.1630

# Fax Transmission Cover Sheet

June 2, 2008

| To | Telephone | Fax Number |
|----|-----------|------------|
| Mathew J. Campoy | | 916.263.0839 |
| California Department of Justice | | |

From:   Matthew G. Jacobs        Client-Matter Number:
        916.930.3267

Re:

Pages:  -  3  - (including this form)      Originals:        will not follow

If there is a problem with this transmission, please call Melissa Sheridan at 916.930.3275

Fax Operator/Ext.

Message:

Please see attached letter.



DLA Piper US LLP
400 Capitol Mall, Suite 2400
Sacramento, California 95814-4428
www.dlapiper.com

Matthew G. Jacobs
matthew.jacobs@dlapiper.com
T  916.930.3267
F  916.403.1630

# Fax Transmission Cover Sheet

June 2, 2008

| To | Telephone | Fax Number |
|---|---|---|
| **Mathew J. Campoy**<br>**California Department of Justice** | | **916.263.0839** |

---

From:    Matthew G. Jacobs          Client-Matter Number:
          916.930.3267

Re:

Pages:   -  __3__  - (including this form)      Originals:          will not follow

**If there is a problem with this transmission, please call Melissa Sheridan at 916.930.3275**

Fax Operator/Ext.

**Message:**

Please see attached letter.

## CONFIDENTIALITY NOTICE

This communication is ONLY for the person named above. Unless otherwise indicated, it contains information that is confidential, privileged or exempt from disclosure under applicable law. If you are not the person named above, or responsible for delivering it to that person, be aware that disclosure, copying, distribution or use of this communication is strictly PROHIBITED. If you have received it in error, or are uncertain as to its proper handling, please immediately notify us by collect telephone and mail the original to us at the above address. Thank you.

(Form Rev. 8/02/04)

WEST\21419223.1